**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| ROBERT KOLINEK, individually and on behalf of a class of similarly situated individuals, | Case No. 13-cv-04806 |
| *Plaintiff*, | Hon. Matthew F. Kennelly |
| v. | |
| WALGREEN CO., an Illinois corporation, | |
| *Defendant*. | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
<u>APPROVAL OF ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARD</u>**

## TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................1

II.   FACTUAL AND PROCEDURAL BACKGROUND ...................................3

    A.    Nature of the Case....................................................................3

    B.    The Litigation and Work Performed for the Class's Benefit ............4

    C.    Mediations with Judge Andersen and Confirmatory Discovery .....6

    D.    The Settlement...........................................................................8

III.  CLASS COUNSEL'S REQUESTED ATTORNEYS' FEE AND EXPENSE
    AWARD IS REASONABLE, FALLS WITHIN THE MARKET RATE FOR
    SIMILAR SERVICES AND THUS, SHOULD BE APPROVED ..............10

    A.    The Market Rate, Exclusive of Risk, is 30% in TCPA Cases Involving
        Similar Settlement Amounts ....................................................11

        1.    Class Counsel have a 33% contingency agreement with Plaintiff ...........11

        2.    Awards in other TCPA cases show fee awards are based on a
            percentage of the recovery starting at 30% and scaling down.................12

    B.    The Risk Associated with the Litigation Justifies a Fee Award Equal
        to 36% of the Realized Benefit to the Settlement Class....................14

        1.    The procedural history shows that the litigation was risky .....................15

        2.    This case presented far greater risk than typical TCPA cases .................17

        3.    Despite the large risks in this action, the settlement provides a greater
            benefit than settlements in similar cases....................................................19

IV.   THE INCENTIVE AWARD IS REASONABLE AND WARRANTS
    APPROVAL ............................................................................21

V.    CONCLUSION ....................................................................21

# <u>TABLE OF AUTHORITIES</u>

**UNITED STATES SUPREME COURT CASES:**

*Mims v. Arrow Fin. Servs., LLC,*
    132 S. Ct. 740 (2012) ...................................................................................................3

**UNITED STATES CIRCUIT COURT OF APPEALS CASES:**

*Americana Art China, Co., Inc. v. Foxfire Printing & Packaging, Inc.,*
    743 F.3d 243 (7th Cir. 2014) .......................................................................................13

*Cook v. Niedert,*
    142 F.3d 1004 (7th Cir. 1998) .................................................................................13, 21

*In re Synthroid Mktg. Litig.,*
    264 F.3d 712 (7th Cir. 2001) ...........................................................................10, 11, 21

*In re Synthroid Mktg. Litig.,*
    235 F.3d 974 (7th Cir. 2003) .......................................................................................13

*In re Trans Union Corp. Privacy Litig.,*
    629 F.3d 741 (7th Cir. 2011) ..................................................................................11, 15

*Redman v. RadioShack Corp.,*
    768 F.3d 622 (7th Cir. 2014) ....................................................................................2, 14

*Silverman v. Motorola Solutions, Inc.,*
    739 F.3d 956 (7th Cir. 2013) .......................................................................................15

*Sutton v. Bernard,*
    504 F.3d 688 (7th Cir. 2007) ..................................................................................10, 12

*Williams v. Rohm & Haas Pension Plan,*
    658 F.3d 629 (7th Cir. 2011) .......................................................................................11

**UNITED STATES DISTRICT COURT CASES:**

*Caine v. Burge,*
    897 F. Supp. 2d 714 (N.D. Ill. 2012) ..........................................................................15

*Craftwood Lumber Co. v. Interline Brands,*
    No. 11-cv-4462, 2015 WL 2147679 (N.D. Ill. May 6, 2015)...............................13, 14, 18

*In re Capital One Tel. Consumer Prot. Act. Litig.,*
    No. 12 C 10064, 2015 WL 605203 (N.D. Ill. Feb. 12, 2015).................................... *passim*

*In re Jiffy Lube Int'l, Inc. Text Spam Litig.*,
    No. 11-md-2261 (S.D. Cal. 2013) ...................................................................20

*Kaplan v. Houlihan Smith & Co.*,
    No. 12-cv-5134, 2014 WL 2808801 (N.D. Ill. June 20, 2014) .........................11

*Kazemi v. Payless Shoesource, Inc.*,
    No. 09-cv-5142 (N.D. Cal. 2012) ....................................................................20

*Kramer v. Autobytel, Inc.*,
    No. 10-cv-2722 (N.D. Cal. 2012) ....................................................................19

*Lozano v. Twentieth Century Fox Film Corp.*,
    No. 09-cv-6344 (N.D. Ill. 2011) ......................................................................20

*Rose v. Bank of Am. Corp.*,
    No. 11-cv-02390 (N.D. Cal. 2014) ..................................................................20

*Satterfield v. Simon & Schuster, Inc. et al.*,
    No. 06-cv-2893 (N.D. Cal. 2010) ...............................................................19, 20

*Weinstein v. The Timberland Co., et al.*,
    No. 06-cv-00484 (N.D. Ill. 2008) ....................................................................19

*Wilkins v. HSBC Bank Nevada, N.A.*,
    No. 14 C 190, 2015 WL 890566 (N.D. Ill. Feb. 27, 2015) ..................11, 12, 14, 18

*Williams v. Gen. Elec. Capital Auto Lease*,
    No. 94-cv-7410, 1995 WL 765266 (N.D. Ill. Dec. 26, 1995) ............................12

**STATUTE:**

47 U.S.C. § 227 .............................................................................................1, 3, 4

**MISCELLANEOUS:**

Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*,
    7 J. Empirical L. Stud. 811 (2010) ...................................................................12

Eisenberg & Miller, *Attorney Fees in Class Action Settlements: 1993-2008*
    7 J. Empirical L. Stud. 265 (2010) ...................................................................18

*FCC Strengthens Consumer Protections Against Unwanted Calls and Texts*,
    FCC News (June 18, 2015) https://www.fcc.gov/document/fcc-
    strengthens-consumer-protections-against-unwanted-calls-and-texts .............17

## I.     INTRODUCTION.

The settlement that forms the basis for Plaintiff Robert Kolinek's ("Kolinek" or "Plaintiff")

request for an award of attorneys' fees, expenses and an incentive award is the result of nearly two

years of litigation that included extensive briefing, motion practice and oral argument on issues of

first impression, formal and informal discovery, and lengthy settlement negotiations—including with

the assistance of the Honorable Wayne R. Andersen (ret.) at multiple mediation sessions. Ultimately,

the settlement is an exceptional result for the Class, both relative to the relief provided under other

TCPA class action settlements and in light of the very real risk that the Class (and Class

Counsel) would not recover on their claims at all.

As to the former, under the settlement Defendant Walgreen Co. ("Walgreens") has agreed to

(i) create an $11 million non-reversionary settlement fund (from which Class Member claims, the

costs of notice and administration, and any award of attorneys' fees and an incentive award will be

paid) and (ii) institute significant prospective measures to ensure that its alleged violations of the

Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA") do not continue into the future.

Based on the current and projected rate of claims through the end of the claims period, Plaintiff

and Class Counsel reasonably anticipate that each claiming Class Member will receive at least

$34 per approved claim. As detailed further below, that amount falls well within the typical

range of individual payments in TCPA settlements (i.e., $20–46) and in many instances, is

greater than the amounts recovered in those other actions.

With respect to the risks Plaintiff and Class Counsel faced, they were legion. Indeed,

Walgreens vigorously defended the legality of its prescription refill reminder calls, arguing that

Kolinek had consented to receive the calls and that in any event, no liability could attach because

the calls fell within the TCPA's emergency purpose exception—an issue of first impression. The

Court initially agreed with Walgreens that Kolinek had consented to receive the calls and

dismissed the case in its entirety. It was only after the Court reversed itself in a rare granting of

Plaintiff's motion to reconsider that the case proceeded. And although the Court denied

Walgreens' bid for dismissal based on the TCPA's emergency purpose exception, it left the door

open to a later dismissal on that basis after further factual development in discovery. Since then,

the Federal Communications Commission ("FCC")—the agency responsible for promulgating

the rules implementing the TCPA—has indicated its intention to issue an order confirming that

similar "prescription refill reminder" calls are, in fact, exempt from liability under the TCPA.

Thus, whether as a result of further discovery or agency rule-making, the Class faced the very

real risk that their claims here would be extinguished altogether and without recovery.

With that as the backdrop, Plaintiff Kolinek now moves the Court to approve (i) the Fee

Award to Class Counsel in the amount of $2,824,200.00 (representing 36% of the Settlement

Fund,[1] less the costs of notice and administration and the proposed incentive award), and (ii) an

incentive award of $5,000 for his service as Class Representative. Both the requested Fee Award

and incentive award are at or below the amounts approved in similar TCPA class actions, are

---

[1]     While the Settlement Agreement provides that Class Counsel will seek no more than 35% of the of the $11 million Settlement Fund (i.e., $3,850,000), Class Counsel understands that per the Seventh Circuit's recent opinions in *Pearson v. NBTY, Inc.*, 772 F.3d 778, 781 (7th Cir. 2014) and *Redman v. RadioShack Corp.*, 768 F.3d 622, 630 (7th Cir. 2014), the costs of notice and administration may not be included in calculating the benefit conferred on the class, even where there is a true common fund as in this case. Thus, consistent with *Pearson* and *Redman*, Class Counsel here seeks a percentage of the Settlement Fund, less the costs of notice and administration (which will be no more than $3.15 million), and Kolinek's proposed incentive award. The reason the Settlement Agreement provides that Class Counsel will seek no more than 35% of the entire $11 million fund is because at the time they signed the Settlement Agreement, the costs of notice and administration had not been determined. Thus, it made the most sense to simply state the maximum amount that Class Counsel could possibly seek, and if it ended up that they would be seeking less than that amount, that obviously would not be an issue. Now that the Parties are certain as to the costs of notice and administration, Class Counsel has accounted for those costs in making their fee request, and are appropriately seeking a far lesser amount than what is provided for in the Settlement Agreement.

consistent with the market rates for such awards, and reflect the results achieved for the

Settlement Class and the substantially greater risks faced in this litigation. For these reasons and

as explained further below, pursuant to Federal Rule of Civil Procedure 23(e), Plaintiff Kolinek

respectfully requests that the Court approve the requested Fee Award and incentive award.

## II.     FACTUAL AND PROCEDURAL BACKGROUND.

A brief summary of the underlying facts and law involved in the litigation, which lends

context to the reasonableness of the requested Fee Award and incentive award, is outlined below.

### A.     Nature of the Case.

Plaintiff filed his putative class action complaint against Walgreens on July 3, 2013,

asserting a single claim for violations of the TCPA. (Dkt. 1 at ¶¶ 7-8, 28-35.) The TCPA

specifically prohibits the use of prerecorded voices in making calls to cellular phones, providing:

> It shall be unlawful for any person within the United States . . . to make any call
> (other than a call made for emergency purposes or made with the prior express
> consent of the called party) using . . . an artificial or prerecorded voice . . . to any
> telephone number assigned to . . . a cellular telephone service[.]

47 U.S.C. § 227(b)(1)(A)(iii). The TCPA was enacted more than two decades ago in response to

"[v]oluminous consumer complaints about abuses of telephone technology." *Mims v. Arrow Fin.*

*Servs. LLC*, 132 S. Ct. 740, 744 (2012). In so doing, Congress specifically sought to prevent

"intrusive nuisance calls" to consumers that it deemed "invasive of privacy," *see id.*, and set

statutory damages in the amount of $500 per violation in addition to providing for injunctive

relief. *See* 47 U.S.C. §§ 227(b)(3)(A)-(C).

Here, Plaintiff alleges that, in an effort to increase its share of the consumer pharmacy

market, Walgreens instituted a program through which it placed "refill reminder" calls featuring

artificial or prerecorded voices to millions of consumers who had previously filled prescriptions

at a Walgreens store. (Dkt. 1 at ¶¶ 3-4.) The problem—Plaintiff alleges—was that Walgreens did

not first obtain consumers' prior express consent to make the calls, as required by the TCPA. (*Id.* ¶ 5.)

Plaintiff alleges further that he is one such Walgreens customer who filled his prescription at a Walgreens pharmacy as many as ten years ago. (Dkt. 93-1 at 4.) At that time, Plaintiff provided his cellular telephone number to a Walgreens pharmacist for verification purposes only, not to receive refill reminder calls in the future. (*Id.*) Plaintiff further alleges that in or around early 2012, he began receiving prerecorded calls on his cellular telephone asking him to fill his prescriptions at a Walgreens pharmacy. (*Id.*) According to Plaintiff, the calls were part of a telemarketing campaign in which Walgreens called consumers' cellular phones in an attempt to bring consumers to Walgreens pharmacies. (*Id.*) Plaintiff alleges that he and the other consumers who were called never consented to receive the calls; but rather, that Walgreens simply pulled their cell phone numbers from its database of customer contact information. (*Id.*)

**B.      The Litigation and Work Performed for the Class's Benefit.**

Class Counsel was able to secure the proposed settlement here only after nearly two years of contentious litigation—including extensive briefing and argument on issues of first impression—against top-tier defense counsel and one of the largest and most well-financed companies in the world.

Walgreens began its defense by moving to dismiss Plaintiff's complaint in its entirety on the basis of two novel arguments: (i) that Plaintiff consented to receive the calls by providing his cellular telephone number to Walgreens for verification purposes, and (ii) that the calls fell within the TCPA's "emergency purpose" exception, 47 U.S.C. § 227(b)(1)(A). (Dkt. 20 at 5-15.) On February 10, 2014, and after the motion had been fully briefed, the Court dismissed the action in its entirety, holding that under binding FCC declaratory rulings, Plaintiff consented to

4

receive the calls by providing his cellular telephone number to Walgreens at some point in the past. (Dkt. 38.) Because the Court found Plaintiff had consented by giving Walgreens his cell phone number, it dismissed his complaint and did not rule on the issue of whether the calls fell under the TCPA's emergency purpose exception. (*Id.*)

Due to the novelty of the issue and subsequent clarification by the FCC about what constitutes "consent" for the purposes of the TCPA, Plaintiff moved to reconsider. (Dkt. 40.) Plaintiff agreed with the Court that the FCC orders were binding, but stressed that they did not represent a categorical rule that the provision of a telephone number at a specific time, for a specific purpose, constituted "consent" to receive calls for any purpose, at any time in the future. (*Id.* at 3-7.) Plaintiff also argued that his complaint did not contain all of the facts necessary for Walgreens to assert a consent defense, since there was no evidence that Kolinek provided his telephone number to Walgreens "knowing" he would receive calls at that number in the future. (*Id.* at 7-9.)

On July 7, 2014, over Walgreens' vigorous opposition (dkt. 44), and after the filing of multiple rounds of supplemental briefing and authority (dkts. 46, 48), the Court took the relatively rare step of vacating its earlier ruling dismissing the complaint and granting Plaintiff's motion to reconsider. (Dkt. 51.) In reversing its prior decision, the Court held that it was "clear that the Court erred" and that Walgreens was unable to assert a consent defense on a motion to dismiss based on the allegations regarding Kolinek in the complaint. (*Id.* at 7.) Notwithstanding its holding on the motion to reconsider, the Court advised that the "accuracy of Kolinek's claim . . . must await factual development." (*Id.* at 8.) Later, the Court reiterated that it "intended to convey that although the complaint's relatively spare allegations regarding the pertinent facts

were insufficient to establish the defense, further factual development might require a different conclusion." (Dkt. 66 at 2.)

Then, on July 22, 2014, the Court took up the second novel question raised by Walgreens' motion to dismiss—whether the prerecorded prescription calls fell under the TCPA's "emergency purpose" exception. (Dkt. 57.) After additional supplemental briefing by the Parties (*see* dkts. 53, 54, 58, 61, 63), the Court held that based on the allegations in the complaint, it did not have sufficient information regarding the prerecorded prescription calls to dismiss under the emergency purpose exception. (Dkt. 66.) The Court, however, again concluded that further factual development would be necessary as to the content and nature of the calls to determine if the emergency purpose exception applied. (*Id.*)

Soon after, Walgreens answered Plaintiff's complaint, raising more than twenty affirmative defenses. (Dkt. 68.) Around this time, the Parties began to discuss the possibility of resolving the case and exchanged information related to, *inter alia*, how the prerecorded prescription call program was initiated, how Walgreens obtained and stored individuals' telephone numbers, how the calls were placed, how many calls were placed and Walgreens' process for obtaining customers' purported consent to receive such calls. (Dkt. 93-1 at 7.)

**C.      Mediations with Judge Andersen and Confirmatory Discovery.**

As detailed in Plaintiff's Motion for Preliminary Approval (dkt. 93-1), as briefing on Defendant's motion to dismiss came to a close, the Parties began to discuss the possibility of resolving the case before additional protracted litigation. Over numerous teleconferences, they talked at length about the substantive issues of the case and their perspectives on how it might be resolved. (*See* Declaration of Rafey S. Balabanian ¶ 6 ("Balabanian Decl."), attached as Exhibit 1.) Eventually, the Parties determined to formally mediate the case and, on October 15, 2014,

convened their first mediation with the Honorable Wayne R. Andersen (ret.) of JAMS (Chicago). (*Id.*) With Judge Andersen's guidance, the Parties were able to reach an agreement on some of the material terms of a class-wide settlement, but they did not reach a complete agreement by the end of the day. (*Id.* ¶ 7.) Instead, the session ended with Plaintiff's proposed settlement offer, which Defendant countered one week later. (*Id.*) After additional discussions over the following days, on October 24, 2014, the Parties finalized the material terms of an agreement in principle to resolve the case, subject to additional (confirmatory) discovery. (*Id.* ¶ 8.)

Thereafter, Plaintiff served formal written discovery requests on Walgreens regarding, *inter alia*, how it had obtained customers' telephone numbers, how any alleged consent to be called had been obtained, how the calls were placed, and how Walgreens maintained records of both the phone numbers and any consent to be called. (*Id.* ¶ 9.) After receiving and reviewing Walgreens' written responses and document production, Plaintiff deposed Walgreens' Rule 30(b)(6) designee and Director of Outbound Programs, Christopher Helzerman, on January 16, 2015, to further explore and understand those issues. (*Id.*)

In addition to formal written and oral discovery, the Parties agreed that Walgreens would—subject to a Protective Order (dkt. 79), and other confidentiality measures—provide to a third party records identifying the telephone numbers to which the alleged calls were made to determine which of those numbers were, in fact, assigned to cellular phones (although not identified as such in Walgreens' database) and thus fell within the Settlement Class definition. (*See* Balabanian Decl. ¶ 10.) In that way, the Parties intended to further confirm the scope of the proposed Settlement Class, ensure an appropriate plan for notifying Settlement Class Members of the settlement, and also confirm the fairness and reasonableness of the settlement. (*Id.*) In February 2015, Walgreens provided that data to third-party administrator, Kurtzman Carson

Consultants ("KCC"). (*Id.* ¶ 11.) KCC organized and analyzed the data and ultimately identified the phone numbers called by Walgreens that were assigned to cellular accounts. (*Id.*) However, due to a discrepancy in the manner in which the data was originally extracted from Walgreens' databases, the Parties determined to re-run the analysis for a second time. (*Id.* ¶ 12.) Upon the conclusion of the second analysis, KCC determined that there were approximately 9.2 million cellular telephone numbers to which Walgreens placed calls during the relevant period. (*Id.*)

Notwithstanding their agreement in principle regarding the key terms of the settlement (i.e., fund size, prospective relief, etc.), the Parties were at odds about other aspects of the settlement, namely the plan for providing notice to the Settlement Class. (*Id.* ¶ 13.) As they could not reach a consensus, the Parties determined to proceed with a second mediation before Judge Andersen, during which they were able to resolve the remaining issues. (*Id*. ¶¶ 13-14.)

With that, the Parties were satisfied that the terms of the proposed settlement were fair, reasonable, and adequate, and proceeded with finalizing their written Agreement. (*Id.*¶ 14.) And, on March 26, 2015, the Parties executed the Agreement now before the Court. (*Id.*)

D.    **The Settlement.**

The fruit of Class Counsel's effort is a settlement that this Court preliminarily approved on April 3, 2015 (dkt. 97), and which fully resolves Kolinek's and the Class's claims against Walgreens in this case. The settlement creates a non-reversionary $11 million common fund, from which all Settlement Class Member claims will be paid. (Dkt. 98-1 at ¶ 1.32.) After settlement administration and notice expenses, an incentive award, and attorneys' fees have been paid, each Settlement Class Member who submits an approved claim will receive a *pro rata* share of the Settlement Fund (which, based on the current number and projected rate of claims through the end of the claims period, Class Counsel estimates will be approximately $34 per

claimant).[2] (*Id.* at ¶ 2.1(b).) In addition, the settlement includes wide-ranging prospective relief requiring Walgreens to implement new procedures to ensure that only persons who provide prior express consent receive prerecorded prescription calls to their cellular telephones, including (i) updating its electronic database to identify customer telephone numbers assigned to either a landline or wireless phone, (ii) implementing procedures to confirm the accuracy of customers' communication preferences, and (iii) providing customers the ability to elect to receive, and unsubscribe from, the prerecorded prescription calls online, during the in-store checkout process, over the phone, and by otherwise contacting Walgreens. (*Id.* at ¶¶ 2.2(a)-(c).) All told, the implementation of these changes to its systems will require Walgreens' expenditure of several millions of dollars in hard costs. (Balabanian Decl. ¶ 24.)

To realize the settlement for the benefit of the Class, Class Counsel were required to spend substantial time and effort litigating this case without compensation. This work included briefing numerous motions, including a motion for class certification, a motion to dismiss, supplemental motions on the issue of whether the calls fell under the TCPA's emergency purpose exception, a motion for reconsideration, a motion for protective order, and a motion for preliminary approval of the settlement. (*Id.* ¶ 18.) Class Counsel also conducted formal and informal discovery (including issuing and reviewing the responses to interrogatories and document requests), worked with a third-party administrator to review data compiled from Walgreens' customer databases, and conducted a Rule 30(b)(6) deposition. (*Id.* ¶ 19.)

Additionally, Class Counsel prepared for and engaged in two lengthy mediations with Judge Andersen, along with numerous follow-up arm's-length settlement negotiations with

---

[2]     The deadline for the submission of claims is July 22, 2015. Thus, the exact amount each individual will receive is presently unknown.

Walgreens' counsel. (*Id.* ¶ 20.) After agreeing on the settlement, Class Counsel drafted a comprehensive Settlement Agreement, including notice documents and declarations. (*Id.*)

Throughout the negotiations, Class Counsel worked to ensure that the class notice was as effective as possible, engaging a professional settlement administrator, KCC, to send direct notice to the Settlement Class by e-mail (where available) and postcard. (*Id.* ¶ 21.) The direct notice, in turn, directed Settlement Class Members to www.prescriptioncallsettlement.com, which contains electronic versions of the Claim Form that can be submitted online, important Court documents, and answers to frequently asked questions. (Dkt. 98-1 at ¶ 4.2(d), Exhibits B-D.) Class Counsel have also prepared and presented to the Court the Motion for Preliminary Approval (Dkt. 93-1), and now that the Settlement Class has been notified of the settlement, spoken with dozens of Class Members weekly to answer questions regarding the settlement, aid in the submission of Claim Forms and the like. (Balabanian Decl. ¶ 23.)

### III. CLASS COUNSEL'S REQUESTED ATTORNEYS' FEE AND EXPENSE AWARD IS REASONABLE, FALLS WITHIN THE MARKET RATE FOR SIMILAR SERVICES AND THUS, SHOULD BE APPROVED.

In common fund settlements like this one, the Seventh Circuit has "consistently directed district courts to 'do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time.'" *Sutton v. Bernard*, 504 F.3d 688, 692 (7th Cir. 2007); *see also In re Synthroid Mktg. Litig.*, 264 F.3d 712, 719 (7th Cir. 2001) ("*Synthroid I*") (cautioning that "any method other than looking to prevailing market rates assures random and potentially perverse results"). Ultimately, "the district court's task when determining the appropriate class action attorneys' fee is to estimate the contingent fee that class counsel would have negotiated with the class at the outset had negotiations with clients having a real stake been feasible." *Wilkins v. HSBC Bank Nevada, N.A.*, No. 14 C 190, 2015 WL

890566, *1 (N.D. Ill. Feb. 27, 2015) (quoting *In re Trans Union Corp. Privacy Litig.*, 629 F.3d 741, 744 (7th Cir. 2011)); *see also Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 635 (7th Cir. 2011) ("When attorney[s'] fees are deducted from the class damages, the district court must try to assign fees that mimic a hypothetical *ex ante* bargain between the class and its attorneys.").

To determine both the applicable market and corresponding market rate for attorneys' fees, even *ex post*, courts in the Seventh Circuit look at three factors: "(1) actual fee contracts between plaintiffs and their attorneys; (2) data from similar cases where fees were privately negotiated; and (3) information from class-counsel auctions." *In re Capital One Tel. Consumer Prot. Act Litig.*, No. 12 C 10064, 2015 WL 605203, at *11 (N.D. Ill. Feb. 12, 2015) (citing *Synthroid I*, 264 F.3d at 718); *see also Kaplan v. Houlihan Smith & Co.*, No. 12-cv-5134, 2014 WL 2808801 (N.D. Ill. June 20, 2014) ("This Court's task is to consider whether [the amount of attorneys' fees sought] is consistent with a hypothetical *ex ante* bargain for the attorneys' work on this case."). In the TCPA class action market, the market rate of fees is well established.

### A.     The Market Rate, Exclusive of Risk, is 30% in TCPA Cases Involving Similar Settlement Amounts.

Application of the relevant factors reveals that in a hypothetical *ex ante* bargain with Class Counsel the Settlement Class would have agreed to pay attorneys' fees as a percentage of the non-reversionary common fund at a base rate of 30%, adjusted slightly upwards for risk.

#### 1.     *Class Counsel have a 33% contingency agreement with Plaintiff.*

The first factor looks to whether the plaintiff has an actual agreement with class counsel regarding payment of attorneys' fees. *Capital One*, 2015 WL 605203, at *11 (citing *Synthroid I*, 264 F.3d at 720). Here, Class Counsel's retainer agreement with Plaintiff Kolinek provides for a contingency fee of 33% of any sum recovered. (Balabanian Decl. ¶ 26.) However, in consumer

class actions the courts often views such agreements as being of little value given the plaintiff is not a sophisticated purchaser of legal services. *Capital One*, 2015 WL 605203, at *11. As such, Class Counsel's agreement with Plaintiff suggests the requested fee is reasonable, but is not conclusive proof of what an *ex ante* negotiation with the entire Settlement Class would have been.

> 2.       *Awards in other TCPA cases show fee awards are based on a percentage of the recovery starting at 30% and scaling down.*

Although the second and third factors contemplate analyzing fees determined *ex ante* or resulting from court-conducted class counsel auctions, such data is "non-existent" in the TCPA class action market, and the district courts have defined the market by looking to how fees were awarded at the end of similar class actions. *See Capital One*, 2015 WL 605203, at *11; *Wilkins*, 2015 WL 890566, at *10. As a general principle, in common fund class actions, the market rate is computed "as a percentage of the benefit conferred upon the class." *Williams v. Gen. Elec. Capital Auto Lease*, No. 94-cv-7410, 1995 WL 765266, at *9 (N.D. Ill. Dec. 26, 1995); *see also Sutton*, 504 F.3d at 693 (directing district court on remand to consult the market for legal services to arrive at a reasonable percentage); Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811, 814 (2010) ("Most federal

judges choose to award fees by using the highly discretionary percentage-of-the-settlement method.").[3] TCPA class actions are in accord.

Recently, the Honorable James F. Holderman (ret.) performed an extensive analysis using data compiled from seventy-one post-2010 TCPA class action settlements to determine the appropriate market rate for the award of attorneys' fees. *Capital One*, 2015 WL 605203, at *12. This analysis showed that "the market rate in a typical TCPA class action [is] a sliding-scale fee," that is calculated based on a percentage of the common fund recovery achieved for the benefit of the settlement class. *Craftwood Lumber Co. v. Interline Brands*, No. 11-cv-4462, 2015 WL 2147679, at *4 (N.D. Ill. May 6, 2015) (citing *Capital One*, 2015 WL 605203, at *16 n.13); s*ee also In re: Synthroid Mktg. Litig.*, 235 F.3d 974, 974 (7th Cir. 2003) ("*Synthroid II*") (providing class counsel 30% of the first $10 million of recovery in a common fund case that then decreases because the market rate percentage of recovery "likely falls as the stakes increase").

The market rate (or sliding scale) for the award of fees in TCPA class actions, prior to accounting for the risks associated with a particular case, is as follows:

| Recovery | Fee Percentage |
|---|---|
| First $10 million | 30% |
| Next $10 million | 25% |
| $20 - 45 million | 20% |
| Excess above $45 million | 15% |

---

[3]  While the market conclusively establishes that the percentage of the fund method is the near-exclusive method for determining fees in a TCPA common fund case, the Court nonetheless has the discretion to award attorneys' fees through a lodestar calculation if it so chooses. *See Americana Art China, Co., Inc. v. Foxfire Printing & Packaging, Inc.*, 743 F.3d 243, 247 (7th Cir. 2014). However, resort to lodestar is typically only appropriate where a settlement has a very low number of claims and any remaining funds revert to the defendant, thus resulting in the court believing the benefit actually conferred to the class is too low to justify use of a percentage. *Id.* Moreover, the Court need only apply one method of determining fees. *Cook v. Niedert*, 142 F.3d 1004, 1013 (7th Cir. 1998) ("[W]e have never ordered the district judge to ensure that the lodestar result mimics that of the percentage approach.").

*Capital One*, 2015 WL 605203*, at \*16 n.13; *see also Wilkins,* 2015 WL 890566, \*1 (applying the 30% market rate fee recovery to the first $10 million of a TCPA class action settlement, which then decreased on a sliding scale); *Craftwood Lumber*, 2015 WL 605203, at \*12 (St. Eve, J.) (same).

Once the appropriate market rate method and percentage are determined, the Seventh Circuit instructs district courts to calculate the applicable attorneys' fee amount by comparing "the ratio of (1) the fee to (2) the fee plus what the class members received." *Redman*, 768 F.3d at 630 (holding that fee awards should solely derive from the realized benefit to the class). In other words, the costs of litigation, notice costs, and incentive awards are not considered as part of the actual benefit conferred to the class and "thus not part of" the calculation. *Capital One*, 2015 WL 605203, at \*10 (quoting *Redman*, 768 F.3d at 630).

Applying that methodology here, the settlement provides for an $11,000,000 non-reversionary settlement fund. (Dkt. 98-1 ¶1.32.) Of that amount, notice and settlement administration costs of $3,150,000[4] and an incentive award of $5,000—all totaling $3,155,000—are deducted, leaving $7,845,000 of the relief directly afforded to the Settlement Class. Taking 30% of the amount remaining equals a base market rate attorneys' fee of $2,353,500.

### B. The Risk Associated with the Litigation Justifies a Fee Award Equal to 36% of the Realized Benefit to the Settlement Class.

Analysis of a reasonable fee, however, does not stop with the base market percentage. Rather, one of the most important factors weighed in determining the reasonableness of a class action fee award is the risk of non-payment that class counsel faced when embarking on the

---

[4]     The Settlement Administrator has agreed to cap the costs of notice and administration at no more than $3,150,000. (Balabanian Decl. ¶ 22.)

action.[5] *Capital One*, 2015 WL 605203, at *15; *see also Trans Union*, 629 F.3d at 746 (same). A risk premium is warranted because "[t]he greater the risk of walking away empty-handed, the higher the award must be to attract competent and energetic counsel." *Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956, 958 (7th Cir. 2013). To illustrate this effect of risk on an attorney's willingness to undertake the litigation, "if the market-determined fee for a sure winner were $1 million the market-determined fee for handling a similar suit with only a 50 percent chance of a favorable outcome should be $2 million." *Trans Union*, 629 F.3d at 746. Ultimately, "a higher risk of loss does argue for a higher fee." *Id.*

### 1. The procedural history shows that the litigation was risky.

In this case, Class Counsel request a Fee Award of $2,824,200, which represents a modest 6% increase over the 30% base suggested by the market rate. That's because, while there is a risk of losing in any case, succeeding in this litigation was by no means a certainty, making a 6% increase over the 30% base market rate both reasonable and entirely justified.

Case in point: this Court at one time dismissed Plaintiff's entire case *with prejudice* based on his voluntary provision of his telephone number to Walgreens. (Dkt. 51.) As reflected in the briefing, the issue of whether the provision of a phone number for any purpose was enough to establish consent to receive calls was hotly contested. The Court originally sided with Walgreens and dismissed Plaintiff's complaint in its entirety. And it was not until Plaintiff took the long-shot of moving to reconsider that the Court agreed that consent for one purpose was not consent for all purposes. *See Caine v. Burge*, 897 F. Supp. 2d 714, 717 (N.D. Ill. 2012) ("Motions to

---

[5]     Risk of nonpayment is one of the factors courts evaluate in determining legal fees, along with the quality of the counsel's performance, the amount of work necessary to resolve the litigation, and the stakes of the case. *Synthroid I*, 264 F.3d at 721. As discussed in Section II.B, *supra*, Class Counsel have devoted significant amounts of time, effort, and resources to the quality work-product involved in this high-stakes litigation, including the novel legal issue of whether the alleged calls fell under the TCPA's emergency purpose exception.

reconsider should be granted only in rare circumstances.") (citation omitted). Despite granting reconsideration, the Court was clear that it viewed Plaintiff's road ahead to be a difficult one, as further factual development may warrant application of Walgreens' consent defense. (Dkt. 51 at 8; Dkt. 66 at 2.) Although Plaintiff's claim ultimately survived the motion to dismiss on the issue of consent, it was a contentious obstacle to overcome and demonstrates that the success in this case was never a certainty.

A second (and far greater) risk confronting Class Counsel was that Walgreens may have been able to successfully claim that the calls were exempt under the TCPA, although not for the reason it originally argued. Plaintiff alleged that Walgreens' calls were "made to consumers who ha[d] previously filled prescriptions at [Walgreens'] pharmacies and purportedly 'remind[ed]' consumers that they should refill their prescriptions," (dkt. 1 at ¶ 4)—and were thus nothing more than "marketing calls." (Dkt. 1 at ¶ 3, dkt. 40, at 4, 5). In response, Walgreens argued that the TCPA's emergency purpose exception applied because the calls were placed to individuals who had prescriptions for maintenance medications (such as cholesterol-lowering medications, diabetes medications, and medications for chronic pulmonary issues), which are vital to the continued health of the patient. (Dkt. 20 at 9-15.) The question was an issue of first impression, and its novelty required the Parties to engage in multiple rounds of briefing and oral argument before the Court's ultimate ruling. (Dkts. 53, 54, 55, 61, 63.) In the end, the Court found that the FCC never interpreted "the [emergency purpose] exception as covering any call to a customer about prescriptions, prescription refills, or anything of the sort, [as] that interpretation would not only bind the Court but would also dictate the conclusion in this case." (Dkt. 66 at 2.)

While the Court was absolutely correct in its ruling, the FCC recently announced a forthcoming order which it indicated will provide a limited exemption from the TCPA when

companies provide "[f]ree calls or texts to . . . remind [consumers] of important medication refills . . . without prior consent." *FCC Strengthens Consumer Protections Against Unwanted Calls and Texts*, FCC News (June 18, 2015), https://www.fcc.gov/document/fcc-strengthens-consumer-protections-against-unwanted-calls-and-texts. While it does not appear that this potential exclusion will be grounded in the emergency purpose exception and it is unclear if it will apply retroactively, it nonetheless demonstrates that it was incredibly risky for Class Counsel to prosecute an issue of first impression that related directly to individuals' health, further supporting a risk enhancer for the Fee Award.

Even if Plaintiff cleared those initial hurdles, Walgreens would undoubtedly challenge a motion for class certification, arguing, *inter alia*, that the consent defense raises individual factual issues, further delaying the possibility of success on the merits. (Balabanian Decl. ¶ 16.) Additionally, if the case proceeded to trial, other roadblocks—such as additional discovery and procurement of expert testimony—would stand in the way of ultimate recovery. (*Id.*) And now that the FCC is planning to implement an order allowing companies like Walgreens to place certain prescription calls without consent, Walgreens would likely have raised the exemption defense again when the FCC issues it order through another motion that will likewise require full briefing, oral argument, and the potential disposition of the case.

Given these risks associated with the litigation, and when viewed in comparison to other similar actions, Class Counsel should be awarded a 6% increase for risk.

> 2. *This case presented far greater risk than typical TCPA cases.*

When the risks faced by Class Counsel here are compared to those faced by counsel in other similar TCPA actions, it becomes all the more apparent that a 6% increase to the base 30% market rate is warranted. *Capital One* is particularly instructive on this point. There, the

attorneys requested fees in the amount of 30% of a more than $75 million settlement fund. *Capital One*, 2015 WL 605203, at *9. In analyzing the request and after an extensive analysis on similar fee awards in TCPA class actions, Judge Holderman determined that the case was "only slightly riskier than a typical TCPA class action." *Id.* at *17 (considering "the class members' alleged consent to be called; Rule 23 manageability issues; and potentially forthcoming FCC orders"). Despite that fact, Judge Holderman held that the small risk merited a 6% increase from the base market fee, meaning that class counsel could recover 36% of the first $10 million—instead of 30%—of the common fund benefit to the class. *Id.* at *18 (citing Eisenberg & Miller, *Attorney Fees in Class Action Settlements: 1993-2008*, 7 J. Empirical Legal Studies 265 (Tab.8) (2010)).

Shortly thereafter, in *Wilkins*, Judge Holderman considered the appropriateness of a fee award in another TCPA action where the attorneys' asked for more than the sliding-scale percentage market rate provided for in *Capital One. See* 2015 WL 890566, at *9. In denying that request, Judge Holderman found that the case was merely "an average TCPA class action" with "the typical obstacles faced by most TCPA plaintiffs." *Id.* at *11 (finding that the defendant's "consent defense" did not carry "the same weight it did [in] *Capital One*[]" and that the "incentives to settlement . . . would most likely overcome any incentives to litigate"). Because the case provided no substantial risk, the court did not apply a risk enhancer to percentages determined by the base market rate analysis. *Id.*; *see also Craftwood Lumber*, 2015 WL 605203 (refusing on reconsideration to award fee beyond base sliding-scale percentage where legal issues in TCPA fax spam case "were not particularly unique").

Unlike those actions, this case, as discussed above, was far from an "average" TCPA class action. The case involved atypical issues that mounted difficult obstacles—most notably,

novel issues about consent and the question of whether Walgreens' calls fell under the TCPA's emergency purpose exception. This Circuit had never confronted either the consent issue or the emergency purpose argument. Confronting those unique questions made this case inherently riskier than a typical TCPA case—including the "slightly risk[y]" *Capital One* action—and further supports an enhanced fee award.

      3.     *Despite the large risks in this action, the settlement provides a greater benefit than settlements in similar cases.*

The risk enhancement becomes even more justified when comparing the benefit this settlement provides to the Settlement Class against the benefits of comparable TCPA settlements. As described in Plaintiff's Motion for Preliminary Approval, the settlement—in terms of tangible monetary relief and improved customer telephone contact practices going forward—is strong, both compared to other similar TCPA actions and when viewed in light of the risks of protracted litigation. In terms of comparables, here the monetary relief of approximately $34 per Settlement Class Member is consistent with other settlements in this area of the law. As noted above, in the prototypical TCPA case—where individuals alleged they received unsolicited telemarketing calls from entities with which they have no connection or relationship—class members generally receive no more than $200. *See, e.g., Kramer v. Autobytel, Inc.*, No. 10-cv-2722, Dkt. 148 (N.D. Cal. 2012) (providing for a cash payment of $100 to each class member); *Weinstein v. The Timberland Co., et al.*, No. 06-cv-00484, Dkt. 93 (N.D. Ill. 2008) (providing for a cash payment of $150 to each class member); *Satterfield v. Simon & Schuster, Inc., et al.,* No. 06-cv-2893, Dkt. 132 (N.D. Cal. 2010) (providing for a cash payment of $175 to each class member); *Lozano v. Twentieth Century Fox Film Corp.*, No. 09-cv-6344, Dkt. 65 (N.D. Ill. 2011) (providing for a cash payment of $200 to each class member). In "mass calling" cases—where tens of millions of individuals and hundreds or even billions of

calls are at issue—class members generally receive between $20 to $40. *See Capital One*, 2015 WL 605203, at \*6 (providing for a cash payment of $34.60 to each class member)[6]; *Rose v. Bank of Am. Corp.*, No. 11-cv-02390 (N.D. Cal. 2014) (same). And finally, "direct relationship" TCPA cases, like the instant one, where the person called voluntarily provided their cellular telephone number to the caller, generally result in coupon settlements or small cash awards. *See Kazemi v. Payless Shoesource, Inc.*, No. 09-cv-5142, Dkt. 94 (N.D. Cal. 2012) (providing for a $25 voucher to each class member); *In re Jiffy Lube Int'l, Inc. Text Spam Litig.*, No. 11-md-2261, Dkt. 97 (S.D. Cal. 2013) (providing for a $20 voucher, which could be redeemed for $15 cash after nine-month waiting period).

In the end, the projected individual recovery of $34 alone supports the fact that this settlement represents an exceptional result for the Settlement Class. But when the risks of the action and awards in similar TCPA actions are considered, the requested risk enhancer of 6%—which is equal to the 6% awarded for only a "slightly" risky case—is more than fair in this instance. *See Capital One*, 2015 WL 605203, at \*15 (finding that a 6% increase—for a total percentage recovery of 36%—was justified in a TCPA case that was only "slightly riskier" than a typical TCPA case with a more than $75 million settlement fund). Accordingly, the market rate and risk factors assumed in this litigation confirms that an award of $2,824,200 to Class Counsel—i.e., 30% of the realized benefit to the Settlement Class and a 6% risk adjustment increase—is both reasonable and justified.

---

[6]     It bears noting that in *Capital One*, where there were several (arguably harassing) calls to each of the class members seeking to collect on debts owed to the defendant, Judge Holderman found that "the $34.60 per claimant recovery…[did] not seem so miniscule in light of the fact that class members did not suffer any actual damages beyond a few unpleasant phone calls, which they received ostensibly because they did not pay their credit card bills on time." *See* 2015 WL 605203, at \*6.

## IV.    THE INCENTIVE AWARD IS REASONABLE AND WARRANTS APPROVAL.

Kolinek's agreed-upon incentive award of $5,000 for serving as the Class Representative warrants approval as well. Because a plaintiff is essential to any class action, "[i]ncentive awards are justified when necessary to induce individuals to become named representatives." *Synthroid I*, 264 F.3d at 722-23. In deciding whether an incentive award is reasonable, courts look to: (1) "the actions the plaintiff has taken to protect the interests of the class"; (2) "the degree to which the class has benefitted from those actions"; and (3) "the amount of time and effort the plaintiff expended in pursuing the litigation." *Cook*, 142 F.3d at 1016.

These factors are readily satisfied in the instant action. Were it not for Kolinek's efforts and contributions to the litigation—e.g., assisting Class Counsel with their pre-filing investigation, filing the case, and participating in the discovery process—the Settlement Class would not have obtained the substantial benefit conferred by the settlement. (Balabanian Decl. ¶ 28.) Further, the proposed incentive award of $5,000 is in line with those awards approved in similar class action settlements. *See Capital One*, 2015 WL 605203, at *19 (granting requested incentive awards of $5,000 for each named plaintiff in a TCPA class action settlement). Accordingly, the requested incentive award is reasonable and should be approved.

## V.    CONCLUSION

For the reasons stated above, Plaintiff Robert Kolinek respectfully requests that the Court approve the requested Fee Award in the amount of $2,824,200, approved the requested incentive award of $5,000 to Plaintiff Kolinek, and award such other and further relief the Court deems equitable and just.

Respectfully submitted,

**ROBERT KOLINEK**, individually and on behalf of a class of similarly situated individuals,

Dated: July 9, 2015        By: /s/ Rafey S. Balabanian
           One of Plaintiffs' Attorneys

Jay Edelson
jedelson@edelson.com
Rafey S. Balabanian
rbalabanian@edelson.com
Ryan D. Andrews
randrews@edelson.com
Benjamin H. Richman
brichman@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

## <u>CERTIFICATE OF SERVICE</u>

     I, Rafey S. Balabanian, an attorney, hereby certify that on July 9, 2015, I served the above and foregoing ***Plaintiff's Memorandum of Law in Support of Motion for Approval of Attorneys' Fees, Expenses, and Incentive Award***, by causing a true and accurate copy of such paper to be filed and transmitted to all counsel of record via the Court's CM/ECF electronic filing system, on this the 9th day of July 2015.

                                    /s/ Rafey S. Balabanian