# In the United States Court of Appeals
## for the Third Circuit

No. 08-2785

SHAWN SULLIVAN; ARRIGOTTI FINE JEWELRY; JAMES
WALNUM, on behalf of themselves and all others similarly situated,

v.

DB INVESTMENTS, INC; DE BEERS S.A.; DE BEERS
CONSOLIDATED MINES, LTD; DE BEERS A.G.; DIAMOND
TRADING COMPANY; CSO VALUATIONS A.G.; CENTRAL SELLING
ORGANIZATION; DE BEERS CENTENARY A.G.,

Defendants/Appellees.

SUSAN M. QUINN,
Objector/Appellant.

On Appeal from the United States District Court for the
District of New Jersey, No. 04-cv-02819
(Honorable Stanley R. Chesler, District Judge)

## BRIEF FOR APPELLANT
SUSAN M. QUINN

Howard J. Bashman
2300 Computer Avenue
Suite G–22
Willow Grove, PA 19090
(215) 830–1458

Plews Shadley Racher & Braun LLP
George M. Plews
Christopher J. Braun
1346 North Delaware Street
Indianapolis, IN 46202
(317) 637–0700

Counsel for Objector/Appellant Susan M. Quinn

# TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................i

TABLE OF AUTHORITIES ...........................................................iv

I.   JURISDICTIONAL STATEMENT ......................................1

II.  STATEMENT OF ISSUES PRESENTED .........................2

III. STATEMENT OF RELATED CASES AND
     PROCEEDINGS ...................................................................4

IV.  STATEMENT OF FACTS ....................................................5

V.   STATEMENT OF THE CASE ............................................10

VI.  SUMMARY OF THE ARGUMENT...................................13

VII. STANDARD OF REVIEW...................................................15

VIII. ARGUMENT ........................................................................17

     A.   The district court abused its discretion by certifying a
          Rule 23(b)(2) class ....................................................17

          1.   Rule 23's requirements are to be enforced
               rigorously.............................................................17

          2.   The district court abused its discretion because
               each class member does not have standing and
               there is no continuing threat.............................. 18

          3.   Plaintiffs' proposed injunction is wholly
               inadequate...........................................................26

     B.   The 23(b)(3) classes were not properly certified because
          common issues do not predominate ...........................27

1.    The settlement classes are overbroad..................27

2.    The district court failed to analyze the consumer protection or unjust enrichment claims..............30

3.    Antitrust conspiracy is not a common question for this overbroad class.......................................31

4.    There was no showing of either (1) common antitrust impact or (2) common damages, and, thus, no Rule 23(b)(3) predominance..................38

5.    The unjust enrichment claims also fail to support predominance because many class members did not purchase a diamond sold by De Beers. ..........................................44

6.    The consumer protection claims similarly do not support a predominance holding. .................45

7.    In re Warfarin does not support approval of the settlement. ....................................................51

C.    The settlement provides inadequate settlement relief to many members of the class .....................................63

D.    The district court abused its discretion when it awarded attorneys' fees that are excessive under all guiding principles...........................................................65

IX.    CONCLUSION....................................................................71

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

**CERTIFICATION OF BAR MEMBERSHIP**

**CERTIFICATE OF SERVICE**

**CERTIFICATION OF ELECTRONIC FILING AND VIRUS CHECK**

# TABLE OF AUTHORITIES

## Cases

*Amchem Prods., Inc. v. Windsor,*
  521 U.S. 691 (1997).................................................18, 30, 55, 58

*Bell Atl. Corp.* v. *AT&T Corp.,*
  339 F.3d 294 (5th Cir. 2003)......................................................38

*Blades* v. *Monsanto Co.,* 400 F.3d 562 (8th Cir. 2005)...................31

*Blewett* v. *Abbot Labs.,*
  938 P.2d 842 (Wash. Ct. App. 1997)..........................................46

*Bobrowizcz* v. *City of Chicago,*
  522 N.E.2d 663 (Ill. App. Ct. 1988) ...........................................49

*Bogosian* v. *Gulf Oil Corp.,* 561 F.2d 434 (3d Cir. 1977) .........39, 40

*Danvers Motor Co., Inc.* v. *Ford Motor Co.,*
  543 F.3d 141 (3d Cir. 2008) ........................................................43

*Desiano v. Warner-Lambert Co.,*
  326 F.3d 339 (2d Cir. 2003) ........................................................56

*Erie R.R. Co.* v. *Tompkins,* 304 U.S. 64 (1938) ...............................50

*Friends of the Wild Swan,* 130 F. Supp. 2d
  (D. Mont. 2000) ....................................................................27, 70

*Gaebler* v. *New Mexico Potash Corp.,*
  676 N.E.2d 228 (Ill. App. Ct. 1996) ...........................................49

*Goda* v. *Abbott Labs.,* No. 01445-96,
  1997 WL 15651 (D.C. Super. Ct. Feb. 3, 1997).........................54

*Hanna* v. *Plumer,* 380 U.S. 460 (1965) ..........................................50

*Illinois Brick Co.* v. *Illinois*, 431 U.S. 720 (1977)......................39, 40

*In re Bridgestone/Firestone, Inc.*,
    288 F.3d 1012 (7th Cir. 2002).......................................................55

*In re Cendant Corporation Prides Litigation*,
    243 F.3d 722 (3d Cir. 2001) ...........................................64, 68, 69

*In re Cmty. Bank of N.*
    418 F.3d 277 (3d Cir. 2005) .......................................................15

*In re G-Fees Antitrust Litig.*,
    584 F. Supp. 2d 26 (D.D.C. 2008)...............................................50

*In re Hydrogen Peroxide Litig.*,
    552 F3d 305 (3d Cir. 2008) ...........................................15, 17, 38

*In re Mercedes-Benz Antitrust Litig.*,
    213 F.R.D. 180 (D.N.J. 2003).....................................................20

*In re Merrill Lynch Secs. Litig.*,
    191 F.R.D. 391 (D.N.J. 1999).....................................................18

*In re New Motor Vehicles Canadian Export Antitrust
Litig.*, 522 F.3d 6 (1st Cir. 2008) ...............................................21

*In re New Motor Vehicles Canadian Export Antitrust
Litig.*, 350 F. Supp. 2d 160 (D. Me 2004) ...................................47

*In re New Motor Vehicles Canadian Export Antitrust
Litig.*, 241 F.R.D. 77 (D. Me. 2007) ...........................................62

*In re New Motor Vehicles Canadian Export Antitrust
Litig.*, 2006 WL 623591 (D. Maine 2006)...................................23

*In re New Motor Canadian Export Antitrust Litig.*,
    241 F.R.D. 77 (D. Me 2007) .......................................................62

*In re OSB Antitrust Litig.*,
    2007 WL 2253425 (E.D. Pa. 2007) ............................................ 40

*In re Prudential Ins. Co. Am. Sales Practice Litig,*
    Agent Actions, 148 F.3d 283 (3d Cir. 1998) ............................... 59

*In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294 (3d Cir. 2005) ......... 15

*In re Warfarin Sodium Antitrust Litig.*,
    391 F.3d 516 (3d Cir. 2004) .................................................. 54, 55

*In re Warfarin Sodium Antitrust Litig.*,
    212 F.R.D. 231 (D. Del. 2002) ..................................................... 51

*In re Worldcom, Inc.*, 358 B.R. 585
    (Bankr. S.D.N.Y. 2006) ......................................................... 44, 45

*Johnson* v. *Microsoft Corp.*, 834 N.E.2d 791 (Ohio 2005) .............. 60

*Koon v. United States*, 518 U.S. 81 (1996) ...................................... 15

*Kyriazi* v. *Western Elec. Co.*,
    647 F.2d 388 (3d Cir. 1981) ........................................................ 18

*Lazy Oil v. Wotco.*, 95 F. Supp. 2d 290 (W.D. Pa. 1997) ................ 21

*Leider* v. *Ralfe*, 387 F. Supp. 2d 283 (S.D.N.Y. 2005) ........ 28, 46, 50

*Leider* v. *Ralfe*, 2003 WL 24571746 (S.D.N.Y. 2003) ................. 8, 28

*Leider* v. *Ralfe*, 2003 WL 22339305 (S.D.N.Y. 2003) ..................... 28

*Major* v. *Microsoft Corp.*, 60 P.3d 511 (Okla. Civ. App. 2002)....... 45

*McCarthy* v. *Recordex Services, Inc.*,
    80 F.3d 842 (3d Cir. 1991) ......................................................... 15

*Mid-West Paper Prods. Co.* v. *Cont'l Group*,
   596 F.2d 573 (3d Cir. 1979) .................................................. 18, 38

*Mulligan* v. *QVC, Inc.*, 888 N.E.2d 1190 (Ill. App. Ct. 2008) ........ 49

*National Super Spuds, Inc.* v. *New York Mercantile Exch.*,
   660 F.2d 9 (2d Cir. 1981) ............................................................ 63

*Ortiz* v. *Fibreboard Corp.*, 527 U.S. 815 (1999).............................. 62

*Ragan* v. *Merchants Transfer & Warehouse Co.*,
   337 U.S. 530 (1949) ..................................................................... 50

*Sickles* v. *Cabot Corp.*,
   877 A.2d 267 (N.J. Super. App. Div. 2005) ................................ 46

*Vacco* v. *Microsoft*, 793 A.2d 1048 (Conn. 2002) ........................... 46

*Wachtel ex rel. Jesse* v. *Guardian Life Ins. Co. of America*,
   453 F.3d 179 (3d Cir. 2006) ........................................................ 30

**Statutes**

15 U.S.C. § 1 .................................................................................. 1

15 U.S.C. § 2 .................................................................................. 1

15 U.S.C. § 16 ..................................................................................

15 U.S.C. § 15 ................................................................................ 1

28 U.S.C. § 1291 ............................................................................ 1

28 U.S.C. § 1331 ............................................................................ 1

28 U.S.C. § 1337 ............................................................................ 1

28 U.S.C. § 1367 ............................................................................ 1

Ga. Code Ann. §10-1-399 ................................................................50

N.Y. Gen. Bus. Law §§349-350 ......................................................46

Mont. Code Ann. §30-14-133 ..........................................................50

Utah Code Ann. §13-11-19 ..............................................................50

## Other Authorities

6A Fed. Proc. L.Ed. § 12:56 ............................................................58

## I.  JURISDICTIONAL STATEMENT

This is an appeal from two May 22, 2008 district court orders: (1) Final Judgment and Order Granting Final Approval to the Class Action Settlement with Defendants (J.A.333–68); and (2) Order Awarding Attorneys' Fees, Reimbursement of Litigation Expenses and Incentive Awards (J.A.5–7.) The underlying complaint was filed under Section 16 of the Clayton Act, 15 U.S.C. §§15 and 26 to obtain relief for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§1 and 2. The district court possessed jurisdiction over this matter pursuant to 28 U.S.C. §§1331, 1337, and 1367.

On March 4, 2008, Ms. Quinn appeared in the district court and objected to the proposed settlement. (J.A.1947–2040.) Ms. Quinn timely filed her Notice of Appeal on June 18, 2008. (J.A.128–30.) This court has jurisdiction to hear Quinn's appeal pursuant to 28 U.S.C. §1291 because the orders appealed from are final decisions of the district court.

## II.   STATEMENT OF ISSUES PRESENTED

1.    Whether the district court erred as a matter of law or otherwise abused its discretion in certifying a class under Federal Rule of Civil Procedure 23(b)(2) when: (a) there was no showing of a continuing threatened injury; (2) there was no showing that all class members would buy diamonds during the injunction period; (3) many class members have an adequate remedy at law and are not entitled to injunctive relief under recent Supreme Court precedent; and (4) the injunctive relief was inadequate?

Designation:    Quinn Objection, J.A.1954–60; Fairness Hr'g Tr., J.A.4875–81; Pls.' Resp. to Obj. – Cert., J.A.4286–92; Cert. Opinion, J.A.284–86, 302–04, 327.

2.    Whether the district court erred as a matter of law or otherwise abused its discretion in certifying the monetary relief classes under Federal Rule of Civil Procedure 23(b)(3) when common issues do not predominate over questions affecting only individual members?

Designation:    Quinn Objection, J.A.1961–71; Pls.' Resp. to Obj. – Cert., J.A.4292–302; Cert. Opinion, J.A.283–84, 327.

3.    Whether the district court erred as a matter of law or otherwise abused its discretion in finding that the relief awarded to the class is fair, reasonable, and adequate?

<u>Designation:</u>    Quinn Objection, J.A.1972–78; Fairness Hr'g Tr., J.A.4873–82; Cert. Opinion, J.A.287–86, 327.

4.    Whether the district court erred as a matter of law or otherwise abused its discretion when it awarded an attorneys' fee in the amount of $73,750,000, which constitutes 25% of the common fund, when the defendants all defaulted, no formal discovery or motion practice was conducted, and the only pleadings prior to settlement in many of the cases were original complaints and unopposed motions to certify a class?

<u>Designation:</u>    Quinn Objection, J.A.1978–80; Pls.' Resp. to Obj. – Atty. Fees, J.A.2586–96; Cert. Opinion, J.A.307–27.

## III. STATEMENT OF RELATED CASES AND PROCEEDINGS

In an order entered July 1, 2008, this Court consolidated the nine appeals from the district court's approval of the class action settlement and grant of attorneys' fees to class counsel challenged herein. The nine consolidated appeals consist of: Appeal Nos. 08-2784 (Murray), 08-2785 (Quinn), 08-2798 (Union *et al.*), 08-2799 (Petrus), 08-2817 (Mathews *et al.*), 08-2818 (Giddings), 08-2819 (Ascione *et al.*), 08-2831 (Dishman *et al.*), and 08-2881 (Hicks).

## IV.  STATEMENT OF FACTS

De Beers was formed in 1888. (French Aff., J.A.819 ¶13.)

> In the late 1800s and early 1900s, De Beers produced and
> marketed ninety percent of the world's rough diamonds. . . .
> As time passed additional diamond mining companies
> entered the market and challenged De Beers' dominant
> position. . . . To deal with the entry of new producers, De
> Beers used its market dominance and created a cartel to co-
> ordinate and regulate the supply of rough diamonds, not
> only from its own mines but also from the mines of other
> market participants. In this manner, De Beers became the
> self-appointed custodian of the diamond industry.

(*Id.*)

> In the mid-1920s, De Beers established the Central Selling
> Organization ("CSO") in order to regulate the supply of
> rough diamonds to the marketplace. . . . As recently as the
> mid-1980s, De Beers and the CSO were responsible for
> purchasing and marketing eighty percent of all rough
> diamonds produced worldwide.

(*Id.* ¶14.)

By the 1990's, however, the rough diamond industry had changed
as a number of new mines became operational, and the De Beers
Group's share of rough diamond production and sales began to decline.
(French Aff., J.A.821 ¶20.) "Left unchecked, the entry of new diamond
mining companies would have resulted in an increase in the quantity of
diamonds supplied to the market. The increase of the quantity supplied,

all else equal, would have resulted in a lower per carat price for rough diamonds." (French Aff., J.A.819 ¶13.)

Russian suppliers also began to demand more control over the sale of diamonds produced in one of De Beers' regions. (Quinn's Am. Resp., Ex.1, J.A.4579.)

> They based their demands on the fact that, by value, Russia had the world's largest diamond production as well as a stockpile of diamonds rivaling De Beers' own $3.3 billion reserves. In 1993 cash-strapped Russia began violating the 1990 marketing agreement signed between the CSO and former Soviet leader Mikhail Gorbachev. Russia began selling large quantities of low-quality diamonds outside the CSO, forcing the CSO to lower its prices for low-quality gems. This in turn prompted Argyle Diamond Mines of Australia, the leading diamond producer in the world, to leave the CSO in mid-1996 and sell still more low-quality diamonds outside the CSO.

(*Id.*)

"Historically, the CSO . . . was able to control directly the supply of rough diamonds in the marketplace by either adding to or withdrawing from its own rough diamond stockpile." (French Aff., J.A.820 ¶15.) To preserve its market control position after Argyle left the CSO, De Beers engaged in a price war with Argyle. (Quinn's Am. Resp., Ex.2, J.A.4585–86.) De Beers intentionally dumped smaller diamonds to lower prices in this price war. (*Id.*)

In 1998, De Beers faced new rivals in Canada, where Australia's largest company, BHP, and the world's largest mining company, U.K.-based Rio Tinto, began to mine high-quality diamonds. (*Id.* at 4579.) In order to control supply, De Beers not only reduced the number of diamonds it sold, it also purchased rough diamonds in the open market. (French Aff., J.A.819 ¶¶13–14.) De Beers held a stockpile of diamonds worth $6.4 billion at the end of 1998. (French Aff., J.A.82 ¶32.)

"In 1998, De Beers retained Bain & Company to undertake a strategic review of De Beers' operations and ways of doing business, which was concluded in 1999." (*Id.* at 821.) De Beers consequently implemented a new business strategy, which included selling down its stockpile of rough diamonds. (*Id.* at 826–7.) De Beers sold at discounts to its Standard Selling Values ("SSV") and was able to offload billions of excess inventories. (Quinn's Am. Resp., J.A.4584.)

After reporting a $6.4 billion stockpile in 1998, De Beers reported a reduced rough diamond stockpile worth $3.9 billion in 1999 and $3.0 billion in 2000. (French Aff., J.A.820 ¶15.) "[S]ince 2001, De Beers reduced its rough diamond inventory stocks by 2.1 billion [dollars]." (*Id.* at 827 ¶34.)

In January 2000, De Beers announced a new sales and marketing program that it called "Supplier of Choice" ("SOC"). (*Id.* at 821.) As part of the SOC, De Beers announced it would cut the number of De Beers' sightholders from 120 to 80. (*Id.*) "To head off any competitive concerns that might be raised by the SOC initiative, the [Diamond Trading Company ("DTC"), the rough diamond sales and distribution arm of De Beers,] applied for a statement from the European Commission that the SOC program would not harm competition." (*Id.* at 822.) In January 2003, the European Commission cleared De Beers for the sale of rough diamonds. (*Id.* at 823.)

At a gathering of Harvard Business School alumni, Nikky Oppenheimer, the chairman of De Beers, openly admitted that De Beers is "a company that likes to think of itself as the world's . . . longest-running monopoly . . . [that seeks] to manage the diamond market, to control supply, to manage prices and to act collusively with our partners in business." *Leider* v. *Ralfe,* 2003 WL 24571746 at *1 (S.D.N.Y. 2003).

De Beers' monopoly actions have not gone unnoticed by the United States government. The U.S. Justice Department filed antitrust actions

against De Beers in 1945, 1957, and 1974. (Quinn's Am. Resp., Ex.1, J.A.4577.)

In 1992, the Justice Department accused De Beers of price fixing the worldwide market for high-grade industrial diamonds. (*Id.* at 4579.) One of the De Beers family of companies, De Beers Centenary, was indicted as a result of that investigation. (De Beers S.A.'s Mem. in Supp. of Final Approval of Am. Settlement Agreement, J.A.2614) In 2004, De Beers agreed to a guilty plea and paid the maximum fine to resolve that indictment. (*Id.* 2614–5.)

De Beers Centenary's plea on industrial diamonds and the resulting speculation that one or more of the companies within the De Beers Group would enter the United States attracted the attention of the class-action bar. In the months after the plea became public, four additional class-action litigations were filed against various De Beers defendants (*Hopkins* in July 2004; *British Diamond* in August 2004; and *Cornwell* and *Null* in February 2005). Prior to that time, there were three lawsuits pending against various entities and executives within the De Beers Group, but these cases were largely dormant. (De Beers

S.A.'s Mem. in Supp. of Final Approval of Am. Settlement Agreement, J.A.2625.)

## V.   STATEMENT OF THE CASE

This is a settlement of seven consolidated class actions, which were all consolidated into *Sullivan*. The consolidated class-action cases are:

1. *Leider, et al.* v. *Ralfe, et al.*, Southern District of New York, Dkt. No. 01-cv-3137 (HB) ("*Leider*"). (J.A.537–80.)

2. *Anco Industrial Diamond Corp.* v. *DB Investments, Inc. et al.*, District Court of New Jersey Index No. 01-cv-04463 (SRC) ("*Anco*"). (J.A.407–20.)

3. *Sullivan* v. *DB Investments, Inc. et al.*, District Court of New Jersey Index No. 04-cv-02819 (SRC) ("*Sullivan*"). (J.A.641–58.)

4. *Hopkins* v. *De Beers Centenary A.G., et al.*, San Francisco County Superior Court, No. CGC-04-432954 ("*Hopkins*"). (J.A.513–32.)

5. *British Diamond Import Co.,* v. *Central Holdings Ltd., et al.,* District Court of New Jersey Index No. 04-cv-04098 (SRC) ("*British Diamond*"). (J.A.452–66.)

6. *Null* v. *DB Investments, Inc. et al.*, Madison County Circuit Court No. 05-L-209 ("*Null*"). (J.A.602–11.)

7. *Cornwell* v. *DB Investments, Inc. et al.*, Maricopa County Superior Court No. cv2005-2968 ("*Cornwell*"). (J.A.499–510.)

(Cert. Opinion, J.A.263–5.); (Am. Settlement Agreement, J.A.1144–7, 1194.)

Defendants defaulted in each case. Ultimately, defendants settled all claims in all 50 states, the District of Columbia, the Commonwealth of Puerto Rico, and the U.S. Virgin Islands, for $295 million dollars. (Am. Settlement Agreement, J.A.1150; 1156.)

The Settlement Agreement created two classes, Direct Purchasers and Indirect Purchasers. Direct Purchasers are purchasers who bought diamonds directly from defendants. The Direct Purchaser Settlement Class consists of all natural persons and legal entities located in the United States who purchased any Gem Diamond directly from a defendant or defendants' competitors. (Cert. Opinion, J.A.338–39; Am. Settlement Agreement, J.A.1156.)

The Indirect Purchaser Settlement Class consists of all natural persons and legal entities located in the United States who purchased any Diamond Product from January 1, 1994 to March 31, 2006.

The Indirect Purchaser Settlement Class has two subclasses:

> **Indirect Purchaser Reseller Subclass**: All persons and entities in the Indirect Purchaser Class who purchased any Diamond Product for resale; and

> **Indirect Purchaser Consumer Subclass**: All persons and entities in the Indirect Purchaser Class who purchased any Diamond Product for use and not for resale.

(Cert. Opinion, J.A.336–37; Am. Settlement Agreement, J.A.1156–57.)

The district court held a fairness hearing on April 14, 2008. (Cert. Opinion, J.A.271.) Quinn's counsel attended and presented argument. (Fairness Hr'g Tr., J.A.4873–82.) The district court approved the settlement. (Cert. Opinion, J.A.333–352.)

## VI.   SUMMARY OF THE ARGUMENT

Although the settlement of litigation is a laudable goal, the law requires that the proposed settlement of a class action be subjected to careful judicial scrutiny lest the rights of non-party class members be improperly compromised in exchange for inadequate consideration.

Unfortunately, in this case the district court allowed De Beers—a self-proclaimed repeat violator of the antitrust laws of the United States—to escape the threat of being held civilly liable for those unlawful transgressions in exchange for an injunction that is either unnecessary or meaningless and a monetary settlement that is both inadequate and was paid to resolve claims that cannot properly be disposed of by means of a class action.

As a result, the only victors here are De Beers, which now can operate in the United States without serious prospect of additional antitrust liability, and class counsel, which achieved a nearly $74 million fee, representing one–quarter of the maximum settlement payout, for settling seven cases in which the defendants had all defaulted.

As explained in detail below, the injunctive relief that the settlement provides is inadequate because plaintiffs' expert witnesses have testified in their affidavits that De Beers no longer has the market power needed to commit the sort of antitrust violations at issue in this case. And the injunctive relief is also meaningless, because at most it provides that De Beers will obey U.S. antitrust laws (as any corporation operating here must do), and the injunction specifically provides that so long as any foreign regulatory body authorizes certain conduct which could be challenged as anticompetitive under U.S. law, De Beers will be immune from liability.

With regard to the monetary relief that the settlement provides, the district court's decision extinguishes the right to recover any damages for class members who stand to recover less than $10.00 under the settlement. This means that a significant number of class members whom De Beers has harmed will recover nothing tangible whatsoever. And the district court's Rule 23(b)(3) inquiry was fatally flawed, because a significant number of class members possess no standing to sue De Beers for federal or state antitrust violations or for any of the other state law claims asserted in the underlying cases.

## VII.  Standard of Review

The issue of standing is a legal issue, over which this Court exercises plenary review. *McCarthy* v. *Recordex Servs., Inc.,* 80 F.3d 842, 847 (3d Cir. 1991).

This Court reviews a class certification order for abuse of discretion, which occurs if the district court's decision "rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *In re Hydrogen Peroxide Antitrust Litig.,* 552 F.3d 305, 312 (3d Cir. 2008) (citation omitted). In particular, "[W]hether an incorrect legal standard has been used is an issue of law to be reviewed de novo." *Id.* (citation omitted)

This Court also reviews the decision whether to approve a class action settlement for abuse of discretion. *In re Cmty. Bank of N. Virginia,* 418 F.3d 277, 298 (3d Cir. 2005).

Finally, this Court reviews the district court's attorneys' fee award in a class action settlement for abuse of discretion. *In re Rite Aid Corp. Sec. Litig.,* 396 F.3d 294, 299 (3d Cir. 2005).

It is well settled that a federal district court abuses its discretion when it issues a legally erroneous ruling. *See Koon* v. *United States*, 518

U.S. 81, 100 (1996) ("A district court by definition abuses its discretion when it makes an error of law.").

# VIII. ARGUMENT

## A. The district court abused its discretion by certifying a Rule 23(b)(2) class.

### 1. Rule 23's requirements are to be enforced rigorously.

This Court has recently stressed that a district court must assess rigorously whether all the prerequisites of Rule 23 are met. *In re Hydrogen Peroxide Litig.*, 552 F.3d at 319, 321. In *Hydrogen Peroxide*, this court "clarif[ied] three key aspects of class certification procedure." *Id.* at 306. First, plaintiffs' burden is far from lenient, and there is no presumption in their favor. *Id.* at 306, 321. A district court should not relax its certification analysis, or presume a requirement for certification is met, merely because plaintiffs claim a violation of the antitrust laws. Rather, the unique facts of each case will generally be the determining factors governing certification. *Id.* at 322. The district court must make factual determinations based on a preponderance of the evidence standard that plaintiffs satisfied *each* Rule 23 requirement. *Id.* at 306.

Second, the district court must "resolve all factual or legal disputes relevant to class certification, even if they overlap with the

merits—including disputes touching on elements of the cause of action." *Id.* Third, the district court's obligation extends to all relevant evidence and all relevant arguments, whether advanced by plaintiffs or defendants. *Id.* This includes expert testimony. *Id.* If a district court's certification fails to satisfy these requirements, the district court has erred as a matter of law. *See id.* at 320.

Rule 23 must be interpreted in accordance with the Rules Enabling Act. *Amchem Prods., Inc.* v. *Windsor,* 521 U.S. 591, 613 (1997). In other words, certification of a class under Rule 23 does not relieve individual class members from their burden to show that they are capable of establishing each the elements of their claims. *In re Merrill Lynch Secs. Litig.,* 191 F.R.D. 391, 395 (D.N.J. 1999) (citing *Kyriazi* v. *W. Elec.* Co., 647 F.2d 388, 394–5 (3d Cir. 1981)).

### 2. The district court abused its discretion because each class member does not have standing and there is no continuing threat.

The applicable standing rules in suits to enjoin antitrust violations are the general rules of standing. *Mid-West Paper Prods. Co.* v. *Cont'l Group,* 596 F.2d 573, 592 n.75 (3d Cir. 1979). The plaintiff needs to show that he is threatened by injury proximately caused by the

defendant. *Id.* Indirect purchasers generally have standing to sue for injunctive relief under § 16 of the Clayton Act. *Id* at 594. But each class member must still establish, as the statute requires, that equity principles entitle them to injunctive relief. *Id.*

De Beers' expert, Mary T. Coleman, noted that De Beers sold, in terms of value, about 64 percent of the worlds' rough diamonds in 2000, which included production from its own mines as well as purchases from other diamond producers. By 2006, De Beers' estimated share of rough diamond sales was 46 percent. (J.A. 4196.)

Other independent entities that are competitors, not conspirators with the De Beers' defendants, have significant market share. Since 2002, the De Beers group has only bought a significant amount of rough diamonds from one competitor, ALROSA, the Russian state diamond producer, and these purchases represent only a minority of ALROSA's output. (J.A. 2638-9.)

The class members who purchased diamonds mined and marketed by competitors of the defendants are *not* indirect purchasers from the defendants. Thus, these class members do not have standing under § 16 of the Clayton Act.

In the case *In re Mercedes-Benz Antitrust Litigation,* 213 F.R.D. 180 (D.N.J. 2003), consumers brought an antitrust suit against the Mercedes' distributor and dealerships, alleging that the defendants had engaged in a price-fixing conspiracy. The court held the relief sought in the matter was not appropriate for certification under 23(b)(2). *Id.* at 186. Plaintiffs sought compensation for a past wrong allegedly perpetrated when they bought their Mercedes-Benz automobiles. *Id.* The complaint sought an injunction against the conspiracy, but there was nothing to suggest that class members would buy more automobiles from the defendants in the future. *Id.* Thus, the court held that any prospective harm that an injunction might prevent was speculative. *Id.*

In this case, many direct purchasers and indirect resellers are no longer in the jewelry business. A retired reseller does not face prospective harm. Most of the members of the consumer class are not buying diamonds mined or marketed by De Beers during the five year injunction period. Any prospective harm an injunction would prevent is again purely speculative. As in *Mercedes,* certification is not appropriate under 23(b)(2).

In order to satisfy the "threatened loss or damage" criterion for seeking injunctive relief under the Clayton Act, a plaintiff must demonstrate a significant threat of injury from an impending violation of the antitrust laws. *Id.* at 591. "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *In re New Motor Vehicles Canadian Export Antitrust Litig.,* 522 F.3d 6, 14 (1st Cir. 2008).

In a 23(b)(2) class, the class proponent must show a continuing threat of injury. *Id.* at 11. Plaintiffs have failed to do so here. The plaintiffs' experts were so pre-occupied with finding a valid damage methodology that they destroyed the ability of any class member to have a valid injunctive claim. The settling parties presented two experts in support of the settlement. Dr. Pisarkiewicz opined, and Dr. French corroborated, that the market for diamonds became much more competitive beginning in mid-2006 and continuing through 2007. According to plaintiffs' experts, this period of time is a "competitive benchmark" to compare the previous period of time. In *Lazy Oil* v. *Wotco Corp.,* 95 F. Supp. 2d 290, 300 (W.D. Pa. 1997), the court noted

that the term "[c]ompetitive benchmark" means a time *not* impacted by an antitrust violation. Because even the plaintiffs' experts opined that the impact of any alleged antitrust violation ceased, there is no continuing threat of injury as of mid-2006.

The absence of any continuing threat is further shown by Dr. Pisarkiewicz's statement that he could not provide damages information in one of the consolidated cases, *Hopkins*. In that case, Dr. Pisarkiewicz initially concluded that

> a before-and-after approach would not be feasible because no date would be available for the period before De Beers had begun to exercise market power. More importantly, no data would be available for the period after De Beers had ceased exercising market power since, at that time, press reports indicated that prices for rough diamonds at the De Beers sights had increased rapidly in 2004 and were continuing to increase in early 2005.

(Pisarkiewicz Aff., J.A.4310 ¶9.) Three years later, Dr. Pisarkiewicz determined that "a before-and-after approach was feasible." (*Id.* at 4311 ¶11.) This is so because of the sharp drop in prices in mid-2006. (*Id.*) Based on the class experts' analysis, there was no continuing threat of injury. Without a continuing threat of injury, none of the settlement classes can properly be certified under 23(b)(2).

The case law confirms this conclusion. In *New Motor*, the district court certified a 23(b)(2) class of automobile buyers/lessees seeking injunctive relief against motor vehicle manufactures, distributors, and dealer associates. *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 2006 WL 623591 at *1 (D. Maine 2006).

The defendants appealed the "Nationwide Injunctive Class." *In re New Motor Vehicles,* 522 F.3d at 11. The Court of Appeals reversed the district court's certification of the Nationwide Injunctive Class. *Id.* at 15–16. The court vacated the class "for lack of a live controversy between the parties such as would justify an injunctive remedy." *Id.* at 16. This is so because the lawsuit was based on the exchange rates between Canada and the United States. *Id.* at 15. Evidence showed that the exchange rate after 2003 had fallen in favor of the Canadian dollar. *Id.* Therefore, after 2003, plaintiffs had no live controversy. *Id.* "[I]n order to obtain forward-looking relief, a plaintiff must face a threat of injury that is both 'real and immediate,' not 'conjectural' or 'hypothetical.' 'Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if

unaccompanied by any continuing, present adverse effects.'" *Id.* at 14 (citations omitted). The same holds true here.

Relevant affidavit excerpts show that the anti-competitive activity—the very activity that plaintiffs allege as the basis of their claim—has ceased:

### Affidavit of John Pisarkiewicz, Ph.D. On Damages and Current Market Conditions

7(4). The before-and-after methodology in this case can only examine the period of alleged anticompetitive behavior followed by the period when anticompetitive activity ceases.

\*\*\*

11. I now conclude that a before-and-after approach is feasible.

\*\*\*

42. De Beers is no longer able to control the quantities available to the market as it had been in the past. In addition, De Beers has lost its dominant share in both mining and in marketing.

\*\*\*

48. Based on the above comments by market observers and participants and on the economic indicators of price, market share and inventory, I conclude that the market for rough diamonds has become much more competitive since mid-2006.

\*\*\*

66.   In this Affidavit, I have concluded that several viable methodologies exist to estimate the overcharges imposed by De Beers in the market for rough diamonds, on an aggregate class-wide basis. I have used one of these methodologies to estimate the percentage overcharge in each year of the class period January 1, 1994 through March 31, 2006. This methodology is based on a comparison of De Beers' gross profit rates during the class period with its gross profit rate for a competitive period extending from July 2006 through December 2007.

(J.A.4309; 4311; 4321; 4323; 4329.)

## Supplemental Affidavit of Gary L. French, Ph.D. Regarding Class Certification Issues

66.   Dr. Pisarkiewicz used De Beers' gross profit margin for the second half of 2006 and all of 2007 as a competitive benchmark that can be compared to profits in earlier years during the class period to calculate annual overcharges.

(J.A.4405.)

Plaintiffs' own experts thus conceded that the alleged De Beers conspiracy did not affect diamond prices after mid-2006. No continuing threat of injury was shown. In fact, plaintiffs' experts contended just the opposite. Therefore, the district court abused its discretion in certifying an injunctive relief class.

### 3. Plaintiffs' proposed injunction is wholly inadequate.

If the district court were correct that an injunction was necessary, then it is readily apparent that the injunction that the district court approved is completely inadequate to protect the rights of class members, such as Quinn, who intend to purchase additional diamond jewelry in the near future and who believe that De Beers' antitrust violations have in fact not ceased.

The injunction shields De Beers from antitrust actions so long as certain governmental bodies—including the European Union—approve De Beers' actions. It is important to note that De Beers' exclusive business model since 2000 has been the Supplier of Choice. (French Aff., J.A.821–22 ¶¶20–23.) The E.U. approved this model in 2003. (French Aff., J.A.823 ¶24.) This means consumers will have substantially *less* antitrust protection than if no settlement is approved!

While the district court contends the injunction in question is "reasonable" because it "prevents defendants from being subject to potentially inconsistent legal requirements of multiple jurisdictions," the district court ignores that its approval of the settlement will allow

De Beers to do what De Beers could not do in the absence of the settlement—breach U.S. antitrust laws so long as *certain* foreign jurisdictions say its conduct is acceptable. The district court counts as a plus that "for the first time" De Beers is subject "to the jurisdiction of a United States Court with the undisputed power to sanction De Beers if it engages in conduct that allegedly had been at the heart of its prior anti-competitive activities." (Cert. Opinion, J.A.304.)

Providing assurance De Beers will abide by U.S. law in doing business in the U.S. adds *no* value to the settlement; *all* companies operating here must do that! *See Friends of the Wild Swan, Inc.* v. *U.S. E.P.A.*, 130 F. Supp. 2d 1207, 1211 (D. Mont. 2000) ("A requirement to abide by the law is not an 'injunction.'") The court abused its discretion by approving the settlement and awarding enormous legal fees while justifying its decision with this ineffective injunction.

### B. The 23(b)(3) classes were not properly certified because common issues do not predominate.

#### 1. The settlement classes are overbroad.

In this case, the district court failed to resolve genuine legal and factual disputes relevant to determining the requirements of Rule 23 when it certified the settlement classes. The classes are overbroad. The

desire to resolve a large case by settlement cannot overcome Rule 23's predominance requirement.

For example, the district court ignored the prior district court's holding in *Leider*, 2003 WL 24571746 at *1, one of the actions consolidated in this settlement, that expressly denied certification in that case for a damages class under the federal antitrust laws, New York state antitrust law and New York consumer protection law. *See Leider* v. *Ralfe,* 387 F. Supp. 2d 287 (S.D.N.Y. 2005); *Leider* v. *Ralfe,* 2003 WL 22339305 (S.D.N.Y. 2003). That holding alone makes a fifty state indirect purchaser damage class improper. It is joining together persons without claims (like the putative class members in *Leider*) in a settlement with those who possess claims; there is no satisfaction of the predominance requirement.

In *Sullivan,* another one of the consolidated actions, plaintiffs sought to certify the following litigation classes:

> (a)   a damages subclass under Rule 23(b)(3) of indirect consumers in 31 states plus the District of Columbia for violations of state antitrust and/or consumer protection laws; and

> (b)    a damages subclass under Rule 23(b)(3) of
>        indirect seller purchasers in 23 states and
>        the District of Columbia.

(*Sullivan*, Pls.' Mem. in Supp. of Class Cert., J.A.774.) As the *Sullivan*

plaintiffs noted:

> Plaintiffs' proposed Consumer Subclass includes
> only consumers in those states that allow indirect
> purchasers to sue for antitrust violations and/or
> have consumer protection laws that provide a
> private right of action to consumers to sue for
> unfair or deceptive trade practices.
>
> Plaintiffs' proposed Reseller subclass includes
> only resellers in those states that allow indirect
> reseller purchasers to sue for antitrust violations
> and/or have consumer protection laws that
> provide a private right of action to resellers to sue
> for unfair or deceptive trade practices.

(*Id.* at 775.)

The *Sullivan* motion to certify a litigation class pointed out to the

district court that since the defendants had defaulted, manageability

issues at trial were not a concern. (J.A.801.) Even with no

manageability concerns, the *Sullivan* plaintiffs were well aware that a

nationwide litigation class could not be certified in this case.

Thus under the plaintiffs' own representation, in at least nineteen

states, there is no viable antitrust claim. The *Sullivan* plaintiffs did not

attempt and could not have persuasively contended that a nationwide indirect purchaser antitrust class could be properly certified.

Despite the clear case law that an indirect purchaser class cannot be certified nationwide, the overbroad settlement classes were certified. The reason for this is set forth in the Report and Memorandum of the Special Master in this case, which provides:

> De Beers, in the pursuit of global peace, demanded a release of potential damage claims in all 50 states and without class members releases from all 50 states the settlement likely would have been less.

(J.A.1440.)

The fact that an antitrust violator demands a nationwide settlement in order to consummate the deal is insufficient to support certification. The Supreme Court has made clear that federal courts lack authority to substitute a standard never adopted—that a settlement is "fair" or "good"—for Rule 23's actual certification criteria. *Amchem,* 521 U.S. at 622.

## 2. The district court failed to analyze the consumer protection or unjust enrichment claims.

In *Wachtel ex rel. Jesse* v. *Guardian Life Ins. Co. of Am.,* 453 F.3d 179 (3d Cir. 2006), this court held that a certification order must

provide a readily discernable clear and complete list of the claims to be treated on a class basis. *Id.* at 187–88. Between the seven different class actions consolidated in this settlement, the plaintiffs brought antitrust, consumer protection/deceptive trade practice and unjust enrichment claims. (J.A.62–64.) In its Opinion, the common operative facts and common questions of law found by the district court all concerned the antitrust claims. (J.A.75.) The only discussion of causation in the district court's opinion was that of antitrust impact. (J.A.76–77.) Thus, the district court only provided its Rule 23 analysis as to the antitrust claims. The district court failed to furnish Rule 23 findings for claims arising under any consumer protection law or claims for unjust enrichment.

### 3. Antitrust conspiracy is not a common question for this overbroad class.

For a class action to be appropriate in an antitrust case, "plaintiffs need to demonstrate that common issues prevail as to [both] the existence of a conspiracy and the fact of injury." *Blades* v. *Monsanto Co.,* 400 F.3d 562, 566 (8th Cir. 2005). It is with respect to these elements that common proofs and legal issues must predominate. *In re Mercedes-Benz Antitrust Litig.,* 213 F.R.D. at 186 (D.N.J. 2003).

Even the question of whether there is an antitrust conspiracy is not common to the enormous classes certified herein. The settlement class is far broader than members who purchased a diamond product directly or indirectly from the De Beers' defendants. The settlement classes cover any individual or entity in the United States that obtained any kind of diamond product during the twelve year class period from any mine in the world. (Cert. Op., J.A.270–71.) Thus, some members of the settlement class purchased a diamond product that included diamonds from entities that were not part of any conspiracy and that were not accused of any wrongful act in this lawsuit. As a result, the question of antitrust conspiracy is not common to the class. The evidence supporting a lack of commonality is abundant.

De Beers' expert, Mary T. Coleman, noted that De Beers sold, in terms of value, about 64 percent of the worlds' rough diamonds in 2000, including production from its own mines as well as purchases from other diamond producers. By 2006, De Beers' estimated share of rough diamond sales was 46 percent. (J.A.4196.)

Other entities had significant market share. Angola and Democratic Republic of Congo have state owned mining companies.

Angola had an estimated 10 percent share of diamond in production in 2006. Congo had a 9 percent share. (J.A.4194.) BHP Billiton's ("BHP") market share was about 6 percent in 2000 and 5 percent in 2006. (J.A.4194.) Rio Tinto's market share was 5 percent in 2000 and 8 percent in 2006. (J.A.4194.)

BHP and De Beers had a three year agreement in which De Beers agreed to purchase 35 percent of BHP's rough diamond production. The agreement ran from 1999 through 2002. (J.A.4208.)

In 1996, Argyle Diamond Mines of Australia, then the leading diamond producer in the world, decided to leave the De Beers-led Central Selling Organization and sell diamonds outside the CSO. (J.A.4579.) After Argyle left the CSO, De Beers engaged in a price war with Argyle. (Quinn's Am. Resp., Ex.2, J.A.4585–86.) De Beers intentionally drove down the price of smaller diamonds in this price war. (J.A.4585–86.)

The De Beers group admits that it "has not bought rough diamond production from Rio Tinto/Argyle since 1996, or from BHP Billiton since 2002." (J.A.2638.)

The plaintiffs' expert for class certification, Gary French, acknowledges that Rio Tinto and BHP Billiton are rough diamond producers independent of De Beers. (J.A.824.)

De Beers' expert says BHP, Rio Tinto, Angola and the Democratic Republic of Congo have sold all of their own production. (J.A.4208.)

Since 2002, the De Beers group has only bought a significant amount of rough diamonds from one competitor, ALROSA, the Russian state diamond producer, and these purchases represent only a minority of ALROSA's output. (J.A 2638–39.)

The above facts present many individualized issues that predominate regarding antitrust conspiracy. For example, Rio Tinto/Argyle was part of the De Beers' cartel until mid-1996. For class members who purchased an Argyle diamond product prior to Argyle leaving the CSO in mid-1996, the argument certainly can be made that the purchaser's diamond product was affected by the De Beers conspiracy.

However, if a class member purchased an Argyle diamond after mid-1996, that diamond product was not part of the De Beers' conspiracy. In fact, that consumer may have benefitted from lower

prices during the De Beers/Argyle price war. Thus, an individualized question is presented. Did the individual class member purchase an Argyle diamond? If so, was the diamond mined and marketed while Argyle was part of the CSO or when Argyle was a fierce competitor of the CSO?

A similar analysis exists for BHP. Did the individual class member purchase a diamond between 1999 and 2002 when De Beers and BHP had a joint marketing agreement? Or did the individual class member purchase a BHP diamond product when BHP sold all of its own production and was independent?

The individual issues continue as to Angola and the Congo. Did the individual class member purchase diamonds from the state owned companies of Angola or the Democratic Republic of Congo? By 2006, 19 percent of class members were buying diamonds from these companies. Again, these companies sold all of their own production.

How do the settling parties respond? The plaintiffs contended that "Plaintiffs' claims arising from other entities, who are De Beers' competitors, give rise to claims against De Beers because plaintiffs allege that those competitors are De Beers co-conspirators." (Pls.' Mem.

in Supp. of Class Cert., J.A.4303.) Indeed, according to their *allegations*, De Beers' competitors are subject to "sanctions if they try to compete with De Beers." (*Id.*)

De Beers presented a contrary analysis in its Memorandum of Law in Support of Final Approval of the Amended Settlement Agreement:

> Asserting mythology as fact, some plaintiffs have alleged that "De Beers" participated in a horizontal cartel that fixed prices or operated as a "single channel" for distribution for all major rough diamond producers.

(J.A.2638.)

> The complaints merely offer boilerplate language that "De Beers" and its co-conspirators agreed to fix, raise, or stabilize prices of diamonds; to regulate the production of diamonds; and to facilitate, effectuate, and implement, the contract, combination, and conspiracy.

(J.A.2631–32.)

> Plaintiffs have not even put forward enough facts to plausibly infer conduct violating the antitrust laws as a matter of pleading. *Cf. Bell Atl. Corp.* v. *Twombly,* 127 S. Ct. 1955, 1970, n.10 (allegations in complaint under Section 1 should include the "specific time, place, or person involved in the alleged conspiracies"). General allegations will not suffice. *See Garshman* v. *Universal Res. Holding Inc.,* 824 F.2d 223, 230 (3d Cir. 1987)

> ("The allegation of unspecified contracts with unnamed other entities to achieve unidentified anticompetitive effects does not meet the minimum standards for pleading a conspiracy in violation of the Sherman Act."). *See Twombly* 127 S. Ct. at 1970.

(J.A.2633.)

The question of whether bare allegations of an antitrust conspiracy are sufficient to satisfy Rule 23 was discussed by this court in *In re Hydrogen Peroxide*:

> Plaintiffs do not contend a bare allegation of a price-fixing conspiracy, in the absence of supporting evidence and analysis, suffices to support class certification consistent with a proper "rigorous analysis" under Rule 23. We emphasize that "[a]ctual, not presumed, conformance" with the Rule 23 requirements is essential. (citation omitted). Applying a presumption of impact based solely on an unadorned allegation of price-fixing would appear to conflict with the 2003 amendments to Rule 23, which emphasize the need for a careful, fact-based approach, informed, if necessary, by discovery.

552 F.3d at 326. Plaintiffs' insufficient allegations of antitrust conspiracy are put at issue by De Beers claims and by the factual record

in this case. Due to the overbroad class certified by the district court, the question of antitrust conspiracy is not common to the class.[1]

### 4. There was no showing of either (1) common antitrust impact or (2) common damages, and, thus, no Rule 23(b)(3) predominance.

In antitrust cases, impact is critically important in determining whether Rule 23(b)(3)'s predominance requirement is satisfied. It is an element of the claim that may call for individual, as opposed to common proof. *In re Hydrogen Peroxide,* 552 F.3d at 311. Where damages cannot be established for every class member through proof common to the class, the need to establish antitrust liability for individual class members defeats Rule 23(b)(3) predominance. *Id.* (citing *Bell Atl. Corp.* v. *AT&T Corp.,* 339 F.3d 294, 302 (5th Cir. 2003)).

The district court found that the plaintiffs presented sufficient evidence for the court to rely on the *"Bogosian* shortcut" for purposes of

---

[1] One of the plaintiffs' experts, Dr. Pisarkiewicz, contended that even if class members did not buy a diamond from the defendants but instead bought a diamond from a competitor of the defendants, De Beers was still liable because other rough producers sold under the De Beers' price umbrella. The "umbrella" theory of antitrust liability has been expressly rejected by this court. *Mid-West Paper Prods.,* 596 F.2d at 573. This court concluded that a purchaser of a product from competitors of the defendant had no standing to sue for damages resulting from such purchases. *Id.* at 587.

proving impact. (J.A.77.) The district court's only analysis of causation for any cause of action was the *Bogosian* presumption of antitrust impact.

In *Bogosian* v. *Gulf Oil Corp.,* 561 F.2d 434 (3d Cir. 1977), this court held that when an antitrust violation affects a class of persons who have standing, proof of impact can be made on a common basis so long as the common proof adequately demonstrates that *each* individual has sustained some damages. *Id.* at 454. In order to use the "*Bogosian* shortcut," therefore, all of the individuals and entities in this settlement class—not just the named plaintiffs—must have standing to bring an antitrust claim. *Id.* at 447. Here, many, if not most, of the members of this settlement class do not have the requisite standing.

The district court certified settlement classes that include indirect purchasers. The United States Supreme Court has previously determined that indirect purchasers do not have standing to bring a federal antitrust damages action because, among other reasons, it is difficult if not impossible to ascertain whether any antitrust overcharge that the direct purchaser pays is passed on and included in the price that the ultimate indirect purchaser pays. *Illinois Brick Co.* v. *Illinois,*

431 U.S. 720, 728–48 (1977). Indirect purchasers may seek damages only under the laws of states that have enacted an *Illinois Brick* "repealer" statute. *In re OSB Antitrust Litig.,* 2007 WL 2253425 *3 (E.D. Pa. 2007).

Twenty states and the District of Columbia have enacted *Illinois Brick* repealer statutes, granting antitrust standing to those indirect purchasers in their states. *Id.* Class members in those states are the class members who have standing to bring an antitrust damage claim in the indirect purchaser classes, not class members from all 50 states.

Moreover, those class members who did not purchase a diamond from De Beers or its conspirators but instead from a competitor are *not* indirect purchasers and do not have standing to bring a damages claim even in *Illinois Brick* "repealer" states. Since all class members do not have standing to bring an antitrust damages claim, the first requirement of the "*Bogosian* shortcut" is not met, and the presumption of impact therefore does not apply.

The second element of the "*Bogosian* shortcut" is that the common proof adequately demonstrates some damage to each individual. *Bogosian,* 561 F.2d at 454. The indirect purchaser settlement class in

this case covers the time period of 1994 to 2006. Gary L. French, Ph.D. was the plaintiffs' expert in three of the seven consolidated actions and the sole expert whom the district court cited and relied on in its predominance analysis. (J.A.277–78) French's affidavit regarding class certification, filed in the *Anco* case, states as follows:

> 30.  In general, determining the extent to which prices were higher than they would have been in the absence of the anticompetitive behavior is done by means of a competitive benchmark. There are generally accepted and recognized competitive benchmarks. One, the "yardstick" benchmark, consists of identifying a comparable market not affected by the anticompetitive conduct. Another, the "during and before or after" benchmark, involves identifying a period of time when the anticompetitive conduct was either diminished or non-existent, within the affected market. Within the market for rough diamonds for example, the rough diamond price during a period of time when defendants' anticompetitive conduct was either diminished or non-existent could serve as a benchmark. Either of these standard benchmarks might be employed to calculate damages in this case.

> 31.  Because De Beers and the DTC control two-thirds of the market for rough diamonds, the overcharge amount or percentage may be estimated by comparing actual prices charged by the CSO and DTC prices that prevail in the remaining third of the market. Alternatively, the damages may be estimated by comparing prices charged by the CSO and DTC in different time periods. For instance, in 2000 De Beers affirmatively announced it was no longer going to act as custodian to the industry, and for a brief period began selling off its stockpile of rough diamonds. Prices of rough diamonds fell during the sell-off, and hence the rough

diamond prices during this sell-off period may be used as a
benchmark to compute the damages.

***

33.    For example, I have reviewed the ITC data and
find that during 1999 there was a substantial drop in the
price of imported diamonds. This drop in price corresponds
to a period of time when it is known that De Beers and the
DTC were selling off part of the stockpile of rough diamonds
held in reserve. Thus, the per-unit value of rough diamonds
fell closer to what may be considered "competitive" levels
during the sell off.

(*Id.* at 434–35.)

Another of Dr. French's affidavits states:

35.    However, looking at the diamond price indices
more closely  .  .  .  reveals an alternative competitive
benchmark that can be employed to compute overcharges
throughout the class period that began on August 25, 2000. .
. . [T]he rough diamond price index fell from 107.5 in
February 2001 to 90.0 in October 2001, before De Beers
resumed buying rough [diamonds] to shore up rough
diamond prices. . . .

***

38.    As explained above, overcharges to the class can
be calculated from the period since January 2004 when De
Beers exercised its market power to increase diamond prices
dramatically. Also the drop in rough diamond prices in 2001,
when De Beers temporarily allowed the market to set prices
which led to a subsequent drop in polished diamond prices,
can be used as a competitive benchmark. Applying this
benchmark to class purchases of polished diamonds would

yield the overcharge damages to the class over the entire class period.

(*Id.* at 5019–20.)

Where there is a "competitive benchmark" that can be measured (as Dr. French measured), the price is *not* affected by an antitrust conspiracy. *See Lazy Oil,* 95 F. Supp. 2d at 300 (W.D. Pa. 1997). Dr. French's report shows that class members who purchased diamonds during 1999 and between February and October 2001 were *not* injured by a De Beers' antitrust violation. Dr. French's affidavits also indicate that the "non-De Beers" remaining third of the market serves as a competitive benchmark.

The factual record also reflects that after Argyle left the CSO in 1996, De Beers engaged in a price war with Argyle. De Beers intentionally drove down the price of smaller diamonds in this price war. Those class members who purchased smaller diamonds at this time were not damaged by, but instead benefitted from De Beers' anticompetitive conduct. That prevents a finding of predominance of common issues on antitrust impact. *See Danvers Motor Co., Inc.* v. *Ford Motor Co.,* 543 F.3d 141, 148–49 (3d Cir. 2008).

Because not all class members were injured, the class certification
must fail under the second required element of the "*Bogosian* shortcut"
because the common proof does not adequately demonstrate some
damage to each individual.

To summarize, the majority of the members of the indirect
purchaser class do not have standing to bring an antitrust damages
claim. The plaintiffs' expert's testimony demonstrates that not all class
members were damaged during the Class Period. Under these facts,
antitrust impact has not been shown with common proof.

### 5.    The unjust enrichment claims also fail to support predominance because many class members did not purchase a diamond sold by De Beers.

The parties who sought certification of this settlement class and
the district court did not address the Rule 23 requirements necessary to
meet the burden for the certification of unjust enrichment claims. The
district court did not even determine that there was a common question
involving unjust enrichment. These claims could not be properly
certified for this overbroad settlement class. For the plaintiffs to state a
claim for unjust enrichment, the plaintiffs must allege the receipt of a
benefit and unjust retention at the expense of another. *In re Worldcom,*

*Inc.* 358 B.R. 585, 602 (Bankr. S.D.N.Y. 2006). Many of the settlement class members purchased a piece of jewelry that did not include a diamond mined or marketed by De Beers. For these class members, the De Beers defendants did not receive any benefit, let alone unjustly retain it. Further, the factual inquiries and determinations required to show that Rule 23's requirements were satisfied for the unjust enrichment claims were not undertaken by the district court.

### 6. The consumer protection claims similarly do not support a predominance holding.

As with unjust enrichment, the parties that sought certification of this settlement and the district court did not address the Rule 23 requirements necessary to certify the consumer protection/deceptive trade practice claims. The district court did not find a common question regarding these claims. These claims could not be properly certified for this case.

Courts in many states that follow *Illinois Brick* have refused to permit an end-run around *Illinois Brick* by permitting consumer protection claims based on the same factual allegations underlying the state antitrust claims. *See e.g., Major* v. *Microsoft Corp.,* 60 P.3d 511, 517 (Okla. Civ. App. 2002) (indirect purchaser cannot avoid *Illinois*

*Brick* by recasting his claims of anticompetitive conduct as a consumer protection act claim.); *Vacco* v. *Microsoft,* 793 A.2d 1048, 1061 (Conn. 2002) (same); *Blewett* v. *Abbot Labs.,* 938 P.2d 842, 846–47 ( Wash. Ct. App. 1997) ("[T]his is the same claim with a different label . . . . We will not interpret the state antitrust law in a matter that 'rewards creative pleading at the expense of consistent application of legal principles.'"); *Sickles* v. *Cabot Corp.,* 877 A.2d 267, 277 (N.J. Super. App. Div. 2005) (permitting an indirect purchaser to recast his antitrust claim as a consumer fraud violation would essentially permit an end-run around the policies only allowing direct purchasers to recover under the antitrust act).

The district court did not rigorously analyze the prior procedural history of the seven actions consolidated in this settlement. In *Leider* v. *Ralfe,* 387 F. Supp. 2d at 283, the district court ruled on the consumers' motion to certify their state law claims. One of the plaintiffs' state law claims alleged violations of N.Y. Gen. Bus. Law §§349–350, which prohibits deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service. *Id.* at 292.

The court found De Beers' conduct, while certainly reprehensible, was not secretive. *Id.* at 296. De Beers' monopolistic practices were public knowledge. Thus, there was no deceptive act. The court denied plaintiffs' motion to certify their state law claims. The consumer protection claims were dismissed. *Id.* at 299. The *Leider* opinion was ignored by the district court in this case.

In *In re New Motor Vehicles Canadian Export Antitrust Litigation,* 350 F. Supp. 2d 160 (D. Me. 2004), the district court, in a sixty-eight page opinion, thoroughly reviewed the various states' laws concerning whether indirect purchasers could recover on various antitrust and consumer protection claims. The court concluded that buyers could proceed for antitrust violations under the laws of sixteen states and the District of Columbia, and for consumer protection violations under the laws of fourteen states and the District of Columbia. *Id.* at 214.

The district court below ignored the *Leider* and *New Motor Vehicles* opinions and relied on the *Null* (one of the consolidated cases identified above) without conducting a rigorous analysis of the procedural history of that case. (Cert. Opinion J.A.279.) No reliance should have been placed by the district court on that nationwide

certification. *Null* was filed in the infamous venue of Madison County, Illinois. The plaintiffs initially brought an Illinois-only class alleging violations of the Illinois Consumer Protection Act. (*Null* Class Action Compl., J.A.602–611.) The De Beers defendants defaulted. (*Id.* at 612.) The plaintiffs, however, filed an amended lawsuit on July 8, 2005 alleging a nationwide class based on the consumer protection laws of the various states. (*Null* Am. Class Action Compl., J.A.619–31.) The plaintiffs also added an unjust enrichment claim.

In advance of the date for defendants to respond to the amended lawsuit, and with the defendants having received no opportunity to show why class certification was not proper, the trial court certified a nationwide class. (*Null* Cert. Order, J.A.636–37.) There was no analysis by the plaintiffs in their motion to certify (*Null* Mot. For Class Cert., J.A.632–35.) or in the order of the Madison County, Illinois state court as to why a nationwide class under the consumer protection laws of all fifty states was proper. (*Null* Cert. Order, J.A.636–37.) *Null* thus represents an instance of the frequently condemned "drive-by" class certification where class certification is achieved essentially on request,

without any judicial analysis let alone the especially intense scrutiny that this Court's case law requires.

Indeed, the class certified in *Null* was not even proper for the original Illinois consumer action, let alone a nationwide action. In Illinois, only the Attorney General can bring an indirect purchaser class action under Illinois' antitrust law. *Bobrowizcz* v. *City of Chicago*, 522 N.E.2d 663, 669 (Ill. App. Ct. 1988). The Illinois Consumer Fraud Act is not an additional antitrust mechanism. *Gaebler* v. *New Mexico Potash Corp.*, 676 N.E.2d 228, 229 (Ill. App. Ct. 1996). The Act's reach is "limited to conduct that directly defrauds or deceives consumers or others." *Id.* The court found that indirect purchaser class action claims are, in actuality, an antitrust claim that can only be brought under the Illinois Antitrust Act and not the Consumer Fraud Act. *Id.* at 230. In turn, under Illinois law, "in the absence of a private cause of action for consumer fraud, unjust enrichment cannot form the basis of liability." *Mulligan* v. *QVC, Inc.*, 888 N.E.2d 1190, 1200 (Ill. App. Ct. 2008).

The *Null* nationwide class certification order was procedurally and substantively defective. It was improper for the district court to rely on that order as a basis for certifying a nationwide class.

The settling parties and the district court did not address how a class member who bought a diamond from a De Beers' competitor has a consumer protection claim against De Beers. Those class members do not have a consumer protection claim.

In addition, some state consumer protection statutes *prohibit* class recovery. For example, under the Georgia, Montana and Utah consumer protection statutes, the right to bring a class action is eliminated or limited. Ga. Code Ann. §10-1-399 (an injured consumer "may bring an action individually, but not in a representative capacity."); Mont. Code Ann. §30-14-133 (consumer can sue as an individual but not through a class action); Utah Code Ann. §13-11-19 (allows actual damages, "but not in a class action."). The Georgia, Montana and Utah statutes are not merely procedural rules; they define the substantive recovery available to an injured consumer.

Where a state law abridges or limits a state cause of action, a federal court exercising diversity jurisdiction is bound to observe the state law that abridges or limits the claim. *See In re G-Fees Antitrust Litig.,* 584 F. Supp. 2d 26, 39 (D.D.C. 2008) (citing *Erie R.R. Co.* v. *Tompkins,* 304 U.S. 64 (1938)); *Ragan* v. *Merchants Transfer &*

*Warehouse Co.,* 337 U.S. 530, 533 (1949); *Hanna* v. *Plumer* , 380 U.S. 460, 470 n.12 (1965); *Leider* v. *Ralfe,* 387 F. Supp. 2d at 291.

Finally, as explained above, the evidence before the district court did not show that all class members had been damaged from De Beers' conduct. Instead, some were not damaged. Some even benefitted from De Beers' conduct. That also prevents a finding of predominance on the consumer protection claims.

The district court ignored two comprehensive federal district court opinions and instead followed a Madison County, Illinois state court order that was procedurally and substantively defective. The district court made no findings regarding the consumer protection claims. There is a lack of a predominance of common issues for these claims.

### 7.    **In re Warfarin does not support approval of the settlement.**

In certain key areas, the settling parties and the district court attempt to follow the analysis of *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231 (D. Del. 2002), *aff'd* 391 F.3d 516 (3d Cir. 2004). In *Warfarin*, the class involved only consumers and third-party payors who paid all or part of the purchase price of one specific brand-name prescription drug (the Coumadin brand of warfarin sodium) sold by a

single company (defendant DuPont Pharmaceuticals Co.). The reliance on *Warfarin* is misplaced.

In *Warfarin,* DuPont allegedly disseminated false and misleading information about Coumadin and its generic competitor. 212 F.R.D. at 236. DuPont allegedly disseminated information claiming generic warfarin sodium was not bioequivalent to Coumadin, thus creating a climate of fear that discouraged the use of generic warfarin sodium and caused millions of prescriptions to be filled with Coumadin that could and would have been filled with less expensive generic warfarin sodium. *Id.* at 241. Plaintiffs alleged that this conduct arose, was directed and emanated from Delaware (DuPont's headquarters) to the detriment of class members throughout the United States. *Id.* at 342. In a key finding, the district court found that since DuPont's headquarters were in Delaware and the alleged deceptive acts originated in Delaware, it was proper to apply the Delaware Consumer Fraud statute to a nationwide class. *Id.* at 251. That legal conclusion was not challenged on appeal.

The district court then responded to various objections to the settlement. One objector argued that claims under various state

consumer fraud and antitrust laws defeated predominance because of variations in the state laws. *Id.* at 249–50. The district court responded that these issues could be minimized by grouping state statutes and common law that share common elements of liability or common defenses. The district court also noted that as far as differences in state law impact only on case management, these differences are irrelevant to certification of a settlement class. *Id.* at 250.

Other objectors objected to certifying a single nationwide class because some members could recover treble damages or punitive damages or "full consideration" damages under their state statutes. *Id.* at 251. The court found that these differences went to damages calculations and did not destroy commonality or predominance. *Id.*

Next, objectors asserted that consumers who paid a fixed co-pay for their prescription drugs could not be included in the certified class because they have suffered no damages. *Id.* at 252. The district court concluded these members need not be excluded from the class because they still had claims for injunctive and other equitable relief. *Id.* The district court also noted that at least one court applied the collateral source rule to allow a consumer class to pursue the full overcharge for

brand name prescription drugs in an antitrust case, even though insurance companies paid some or all of some of the overcharge. *Id.* at 259 (citing *Goda* v. *Abbott Labs.,* No. 01445-96, 1997 WL 15651 (D.C. Super. Ct. Feb. 3, 1997)).

Another objector asserted that the Third Party Payers lacked standing to assert claims under the antitrust laws, so that they should receive a much smaller share or none of the settlement fund. *Id.* at 259. The district court found that the TPPs were arguably in the same position as consumers in that they allegedly paid supracompetitive prices for Coumadin. The TPPs, as much as the consumers, could be considered the target of DuPont's antitrust violations, in that they were the end parties absorbing the overcharges for the drugs. *Id.* The district court then found that even if the TPPs did not have standing to assert direct claims, they would have subrogation claims against consumer class members. *Id.*

On appeal, no one challenged whether the Delaware Consumer Fraud Statute applied to the entire nationwide class. Several appellants did argue that the district court erred when it certified a single nationwide class of plaintiffs because variations in the consumer fraud

and antitrust laws of the fifty states defeated commonality and predominance. *In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 528 (3d Cir. 2004). The appellants principally relied on the case *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012 (7th Cir. 2002). This Court distinguished *Bridgestone* because, when dealing with variations in state laws, the same concerns with regards to case manageability that arise with litigation classes are not present with settlement classes. Thus, those variations are irrelevant to certification of a settlement class. *Warfarin,* 391 F.3d at 529 (citing *Amchem,* 521 U.S. at 620).

Appellant Hutchinson argued that the district court erred in when it certified a single class including both fixed co-pay consumers and out-of-pocket consumers. *Id.* at 530. According to Hutchinson, because fixed co-pay consumers suffered no injury or did not suffer the same injury as out-of-pocket consumers whose economic loss varied with the conduct of DuPont, the district court should either have excluded fixed co-pay consumers from the class or otherwise created a separate sub-class for them. This Court disagreed, noting fixed co-pay consumers did possess viable equitable and common law claims for unjust enrichment as well as claims for injunctive relief against DuPont. *Id.* Thus, the district

court did not err when it included fixed co-pay consumers with out-of-pocket consumers in the same class. *Id.*

Finally, several appellants objected to the inclusion of TPPs in the certified class on the grounds that TPPs did not have standing to assert antitrust claims, or in the alternative that their claims were not as strong as those of the consumer plaintiffs. *Id.* This court found no error in the inclusion of TPPs in the certified class. TPPs, like individual consumers, suffered direct economic harm when, as a result of DuPont's alleged misrepresentations, they paid supracompetitive prices for Coumadin instead of purchasing lower-priced generic warfarin sodium.

This Court noted that the Second Circuit had held that when insurance companies "allege an injury directly to themselves" and "the damages were in no way derivative of damages to a third-party," the insurance companies had standing to directly sue defendants. *Id.* at 531 (citing *Desiano* v. *Warner-Lambert Co.,* 326 F.3d 339 (2d Cir. 2003)) (recognizing the right of health benefit providers to recover from drug companies the amounts that were overpaid due to illegal or deceptive marketing practices). Therefore, appellants' suggestion that TPPs

should have been excluded from the class or categorized in a separate

subclass was found without merit. *Id.*

Here are the key findings and conclusions in *Warfarin:*

> (a) since DuPont's headquarters were in Delaware, and the deceptive acts occurred in Delaware, the Delaware Consumer Fraud statute applied to the nationwide class.

> (b) the fixed co-pay class members were damaged and under the collateral source rule could pursue the full overcharge, even though insurance companies paid some or all of the overcharge. Those class members also had claims for injunctive and other equitable relief.

> (c) the third party payers had standing to directly sue the defendants and should be included in the class.

> (d) since this was a settlement class and manageability was not a concern, variations in state law were irrelevant to the certification inquiry.

By contrast, this case presents a far different factual and

legal scenario.

> 1. The De Beers defendants are not headquartered in this country.

> 2. There is no showing of a deceptive act. A previous court has ruled that De Beers' conduct was not secretive or deceptive.

3. No single state consumer protection or antitrust statute applies to this nationwide class.

4. This is not a claim regarding one prescription drug manufactured by one defendant. This class purports to cover every diamond purchased in the United States over a twelve year period, including diamonds mined and marketed by competitors of the defendants.

5. Plaintiffs' experts declared that De Beers' anticompetitive conduct ceased in mid-2006. Since there was no continuing threat of injury based on the factual record before the district court, no class member has an injunction claim.

6. Many class members do not have any antitrust, consumer protection, or unjust enrichment claims, which are the only claims alleged by plaintiffs in this case.

It is correct that, when confronted with a request for settlement-only certification, a district court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there would be no trial. *Amchem,* 521 U.S. at 620.

However, the *other* requirements of Rule 23—those designed to protect absentees by blocking unwarranted or overbroad class definitions—demand undiluted, even heightened attention in the settlement context. *Amchem,* 521 U.S. at 620. The very definition of an

overbroad class is one which includes persons who do not actually have a claim. 6A Fed. Proc. L.Ed. §12:56.

Quinn's objections to the certification of this settlement primarily are based on a lack of predominance of common issues. In *Amchem*, while the Supreme Court says manageability is not a factor for a settlement class, it also provides that the predominance inquiry trains on the legal or factual questions that qualify each class member's case as a genuine controversy, questions that *preexist* any settlement. Id. at 623. This court, in *In re Prudential Ins. Co. America Sales Practice Litigation Agent Actions,* 148 F.3d 283, 314 (3d Cir. 1998) noted that *Amchem* rejected the idea that the benefits of settlement are relevant to the predominance inquiry. The test for predominance is not lessened with a settlement class—it is heightened.

The settling parties and the district court attempted to track some of the analysis from *Warfarin*. For example, the plaintiffs did not disagree with Quinn's contention that many indirect purchasers lack standing to pursue an antitrust claim. Instead, the plaintiffs contend that a different legal standard should apply:

> [I]t is not true that some indirect purchasers have a "valid" claim and others do not. While it is correct that some class members do not have a cause of action under state antitrust laws, they still have valid claims under state law which they are giving up in exchange for the settlement fund, including claims for deceptive trade practices, consumer fraud, unjust enrichment. (J.A.4283.)

The district court, without *any* analysis of the supposed state law claims involved under any particular state's law, followed this analysis finding that:

> [A]ll members of each class have valid claims under state law, albeit not identical claims in all situations, that they are ceding in exchange for the settlement fund and injunction. (J.A.283)

This is an errant conclusion of law by the district court. A clear example is found in the law for the State of Ohio. In *Johnson* v. *Microsoft Corp.*, 834 N.E.2d 791 (Ohio 2005) the Ohio Supreme Court held:

> 1) [C]onsistent with long-standing Ohio jurisprudence, which has followed federal law in antitrust matters, we adopt and follow *Illinois Brick*'s direct-purchaser requirement and hold that an indirect purchaser of goods may not assert a [ ] claim for alleged violations of Ohio antitrust law.

*Id.* at 798.

> 2)    [A]n indirect purchaser cannot assert a common-law claim for . . . unjust enrichment against a defendant without establishing that a benefit had been conferred upon that defendant by the purchaser. The facts in this case demonstrate that no economic transaction occurred between [the plaintiff] and Microsoft, and, therefore, [the plaintiff] cannot establish that Microsoft retained any benefit "to which it is not justly entitled."

*Id.* at 799.

> 3)    [A] complaint that alleges a violation of the Ohio Consumer Sales Practices Act (CSPA) predicated upon monopolistic pricing practices does not state a claim upon which relief can be granted because the Valentine Act[, the Ohio antitrust statute], not the CSPA provides the exclusive remedy for engaging in such conduct. *Id.* at 288.

Thus, under the holding of the Ohio Supreme Court, an indirect purchaser does *not* have a claim under Ohio's antitrust law, consumer protection law or for unjust enrichment. Directly contrary to the district court's conclusion, an Ohio class member does not have a valid claim under Ohio law. For many of the states that follow *Illinois Brick*, class members have no state law claim.

Those class members who did not purchase a diamond from De
Beers or its conspirators but instead from a competitor are *not* indirect
purchasers and do not have standing to bring any damages claim.

The certification of the settlement classes in this case is directly
contrary to binding Supreme Court precedent and the Rules Enabling
Act. Fed. R. Civ. P. 23's requirements must be interpreted in keeping
with the Rules Enabling Act which instructs that rules of procedure
"shall not abridge, *enlarge* or modify any substantive right." *Amchem,*
521 U.S. at 613 (emphasis added). No reading of Rule 23 can ignore the
Rules Enabling Act's mandate. Congress never gave, nor did the federal
courts ever claim, the power to create substantive rights denied by state
law. *Ortiz* v. *Fibreboard Corp.,* 527 U.S. 815, 845 (1999).

In Ohio and many other states, the substantive state law denies
recovery to indirect purchasers or expressly prohibits class actions. The
district court, by certifying these classes created substantive state legal
rights. That is directly contrary to binding U.S. Supreme Court
precedent and the Rules Enabling Act. *See In re New Motor Canadian
Export Antitrust Litig.*, 241 F.R.D. 77, 83–84 (D. Me. 2007), rev'd on
other grounds, 522 F.3d 6 (1st Cir. 2008). (district court determined it

- 62 -

could not certify statewide damage classes for Georgia, Montana, and Utah because "[w]hen the issue is one of state substance and federal procedure, the state substantive rule controls.") It was an abuse of discretion.

### C. The settlement provides inadequate settlement relief to many members of the class.

Ms. Quinn has an unjust enrichment claim, which entitles her to monetary relief. The distribution plan for Consumers contains a $10.00 minimum amount per claim. (J.A. 2531.) It was Class Counsel's conclusion that payments to class members under $10.00 are not justified because of high administrative costs. (J.A. 1549.)

The size of the consumer subclass ranges between 67 and 117 million members. (J.A. 1548.) If each of the 67 million members filed a claim, each claimant would be paid $2.02. If each of 117 million members filed claims, the average payment would be $1.16. *Id.*

The Special Master's Report expected that 90% of the Consumer claims would be filed online. (J.A. 1550.) The cost to the administrator for online claims not requiring documentation is approximately thirty cents, compared to a range between 90 cents and a dollar and ten cents to administer the same claim as a paper claim. *Id.* In exchange for their

release, millions of class members receive no money. That is inadequate, unreasonable, and unfair.

In *National Super Spuds, Inc. v. New York Mercantile Exch.,* 660 F.2d 9 (2nd Cir. 1981), the Second Circuit rejected exactly what the plaintiffs attempt to do here:

> It thus appears that the judge's reason for approving the settlement, namely, that it is fair and reasonable to the class as a whole, will not pass muster. An advantage to the class, no matter how great, simply cannot be bought by the uncompensated sacrifice of claims of members, whether few or many.

*Id.* at 19.

This Court should follow the Second Circuit's reasoning. The uncompensated sacrifice of claims of millions of class members, including Quinn, does not pass muster.

In addition to the above point, Quinn adopts the other Appellants' briefs regarding the inadequacy of the settlement. The district court abused its discretion in approving the settlement.

**D.** **The district court abused its discretion when it awarded attorneys' fees that are excessive under all guiding principles.**

In *In re Cendant Corporation Prides Litigation,* 243 F.3d at 722 (3d Cir. 2001), this Court vacated and remanded a 5.7% attorneys' fee award, which produced a $19,329,463 fee. *Id.* at 743. This court was "seriously troubled" by the district court's award, and found that it constituted an abuse of discretion. *Id.* This court found that the case "was neither legally nor factually complex and did not require significant motion practice or discovery" by class counsel. *Id.*

In the case at bar, class counsel received over $73 million in a default case. De Beers never filed an answer. There was no motion practice. The only briefing done was related to class certification and settlement. There was no discovery against De Beers. (Special Master Report - Settlement, J.A.1443.) Instead, De Beers provided informal disclosure of information, on its own terms, consisting of materials selected by De Beers. (*Id.* at 1440; 1446.)

The district court's fee order awards class counsel $73,048,047.26. (Fees Opinion, J.A.329.) This is 25% of the $295,000,000 principal settlement fund less expenses of $2,807,810.94. (*Id.*) This award is

excessive given the procedural history of the case, the number of class members (which made even a nominal settlement amount a large number), and the lack of risk taken by class counsel (having a settlement without any trial or even trial preparation). Thankfully, Judge Chesler rejected the Special Master's recommendation that class counsel may receive 25% of the interest, which at the time was an additional $28 million. (Fee Opinion, J.A.330; Special Master Report – Fees, S.A.52–53.)

The consumer class is estimated to consist of between 67 million and 117 million members; the reseller subclass contains an additional 38,152 members. (Special Master Report - Fees, S.A.24.) The Special Master noted that "[t]his fact weighs in favor of some decrease in the percentage of recovery solely because of the size of the class." (*Id.*) The Special Master, however, determined that the value of the injunction offsets this factor. (*Id.*) ("The plaintiffs seek an award of fees as a percentage of a Settlement Fund that is less than the entire benefit conferred on the classes."). But the Special Master acknowledged that there is no way to value the injunctive relief without speculation. (*Id.* at

23.) ("[T]he Special Master does not believe that a monetary value can be placed on [the injunctive relief], other than by pure speculation.").

The injunctive relief is scheduled to last only for five years and is limited in scope as explained above. It may provide a shield for De Beers rather than a restraint. It does not actually assure compliance with U.S. antitrust law. The district court should not have approved a 25% award in a "mega-fund" case that was legally and factually uncomplicated based on a speculative amount for monetary relief. This is especially so where the district court found that "the large size of the Settlement Fund is *unquestionably* tied to the size of the settlement classes, a factor that weighs in support of decreasing the percentage of recovery due to class size." (Cert. Opinion, J.A.314.) (emphasis added.)

According to the Special Master's findings, class counsel expended approximately 38,684 hours on these default cases. (S.A.43.) These hours include both lawyers and paralegal time. (S.A.44.) This makes the hourly rate $1,887 per hour for all hours, including paralegals. Many (probably most) of these hours were spent responding to objectors and amicus in the individual consolidated cases as opposed to litigating the merits of the case against the defendants. (*See* S.A.31) (noting

"substantial opposition from intervenors or <u>amici</u>.") Additionally, many of these hours were expended *after* settlement, which defeats any argument that an increased contingency percentage award is warranted due to the risk of no recovery. (*See* S.A.33–34.) The *Sullivan* complaint was filed on June 1, 2004 in New Jersey federal district court. Defendants put $250,000,000 into an interest bearing escrow account just six months later. (Am. Settlement Agreement, J.A.1158.) After that time, plaintiffs' counsel risked nothing in the way of recovery.

Hours that garnered high fee awards in the cases reviewed in *Cendant* involved hours spent in discovery, depositions, and document review aimed at the defendants. *In re Cendant*, 243 F.3d at 739–41. The Special Master below acknowledged that a 25% award in this case is "on the high end of the range" but did not perform an analysis like that provided in *Cendant* to support a high award. (S.A.43–44.) He concluded, with no basis, that the case has "all of the characteristics that the Third Circuit recognizes support a high award: complex and/or novel legal issues, extensive discovery, acrimonious litigation, a remarkably broad injunction, and tens of thousands of hours spent on the case by class counsel." (*Id.* at 38.) Simply listing these issues is not

enough to satisfy this Court's requirement that attorneys' fee awards be vigorously reviewed. Moreover, many of the characteristics listed are, in fact, not present in this case. There were no complex or novel legal issues; class counsel did not perform extensive discovery; there was no acrimonious litigation with defendants; and the injunction is grossly insufficient, thereby benefitting De Beers, not the class.

The required check against the lodestar also shows the district court abused its discretion by awarding an excessive attorneys' fee recovery. The Special Master accepted class counsel's lodestar multiplier, which is approximately 3.3. (*Id.* at 43.) "In all the cases in which high percentages were applied to arrive at attorneys' fees, the courts explained the extensive amount of work that the attorneys had put into the case, and appropriately the lodestar multiplier in those cases *never* exceeded 2.99." *In re Cendant*, 243 F.3d at 742 (emphasis added). Given class counsel's lodestar calculation, their *average base hourly rate*, lawyers and paralegals together, is $570 per hour. (Special Master Report – Fees, S.A.43.) There is no mention in the Special Master Report of, and evidently no investigation into, how many of these hours are attributable to paralegals versus attorneys. Again, the

Special Master acknowledges that the average rate is high yet fails to reconcile it with class counsel's performance. (*Id.* at 43–44.) ("Although this hourly rate appears to be on the high end of the average rates addressed in other cases, when viewed through the prism of the lodestar devoted to the injunction, it is sustainable.")

The district court did not specifically analyze any of these objections to the fees awarded. It recites that the injunction, whose value it could not quantify, "requires De Beers to abide by state and federal antitrust laws," which it finds is "a substantial benefit to the general public and to members of the settlement class." (Cert. Opinion, J.A.314.) Of course, *any* corporation or other business that wants to operate in the United States must do that, so there is no "substantial benefit" in that to anyone. *See Friends of the Wild Swan*, 130 F. Supp. 2d at 1211 (injunction requiring a defendant to abide by the law is not beneficial). But more significantly, the district court's assessment of the injunction is simply incorrect. To the contrary, it specifically sanctions violation of those laws so long as some other country says what De Beers does is acceptable. (Cert. Opinion, App. H, J.A.1235–36.) The order and stipulated injunction enumerates prohibited conduct but then

allows any conduct so long as any specified domestic or foreign government competition enforcement agency approves of the conduct. (*Id.*) Specifically the order states:

> [N]othing in this paragraph shall preclude De Beers from . . . (ii) Entering into agreements, arrangements or undertakings which receive clearance or approval from an antitrust or competition regulator with authority to review such agreement, arrangement or undertaking, including the United States Department of Justice, the European Commission and/or the competition enforcement agencies of the member states of the European Union, and the competition enforcement agencies of Australia, Canada, Russia, and South Africa . . . .

(*Id.* at 1236.) This order expands De Beers rights. In theory, De Beers could be violating U.S. antitrust laws so long as the conduct is permitted in one of the other identified countries, such as Russia or South Africa. The unprecedented size of the fees in a default case that frees a notorious monopolist to operate in the United States without fear of our antitrust laws is unsupported by any legal authority or common sense and should be disallowed.

## IX. CONCLUSION

In conclusion, the class definitions are overbroad, the injunctive relief is illusory, there is no monetary relief to a significant portion of the class and the attorneys' fees are

excessive. For the reasons set forth above, this Court should vacate the district court's approval of the class action settlements and should vacate the district court's approval of class counsel's attorneys' fee request.

Respectfully submitted,

<u>/s/ *Howard J. Bashman*</u>
Howard J. Bashman
2300 Computer Avenue
Suite G–22
Willow Grove, PA 19090
(215) 830–1458

Counsel for Objector/Appellant
Susan M. Quinn

# CERTIFICATION OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,503 words excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(A)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2003 in 14 point Century Schoolbook font.

Dated: March 27, 2009          _/s/ Howard J. Bashman_

# CERTIFICATION OF BAR MEMBERSHIP

I hereby certify that I am a member of the Bar of the United States Court of Appeals for the Third Circuit.

Dated: March 27, 2009                    /s/ *Howard J. Bashman*

# CERTIFICATE OF SERVICE

I hereby certify that all counsel listed immediately below on this Certificate of Service are Filing Users of the Third Circuit's CM/ECF system, and this document is being served electronically on them by the Notice of Docket Activity:

Becker, Howard B.
Bernstein, William
Biggio, Jessica
Ciani–Dausch, Francis
Cooper, Josef D.
Corbitt, Craig C.
Fastiff, Eric B.
Harris, Edward W., III
Kupfer, Susan G.
Maher, John A.
Sagat, Mark J.
Stamell, Jared
Sunshine, Steven C.
Tabacco, Joseph J., Jr.

Also on the date shown below, ten copies of this document were dispatched for filing via Federal Express overnight delivery to the Clerk's Office of the U.S. Court of Appeals for the Third Circuit in Philadelphia, Pennsylvania.

Dated: March 27, 2009                    */s/ Howard J. Bashman*

## CERTIFICATION OF ELECTRONIC FILING
## AND VIRUS CHECK

Counsel for Objector/Appellant Susan M. Quinn hereby certifies that the electronic copy of this Brief for Appellant Susan M. Quinn is identical to the paper copies filed with the Court.

A virus check was performed on the PDF electronic file of this brief using Norton Internet Security virus scan software.

Dated: March 27, 2009                    /s/ *Howard J. Bashman*